Andrea R. Woods*
American Civil Liberties Union
Foundation, Criminal Law Reform
Project
125 Broad Street, 18th Fl.
New York, NY 10004
(212) 549-2528
awoods@aclu.org

Alex Rate
Elizabeth Ehret
American Civil Liberties Union of
Montana Foundation, Inc.
P.O. Box 9138
Missoula, MT 59807
Telephone: (406) 203-3375
ratea@aclumontana.org
ehrete@aclumontana.org

Toby J. Marshall*
Beth E. Terrell*
Blythe H. Chandler*
Terrell Marshall Law Group, PLLC
936 N. 34th Street
Suite 300
Seattle, WA 98103
(206) 816-6603
tmarshall@terrellmarshall.com
bterrell@terrellmarshall.com
bchandler@terrellmarshall.com

*Pro Hac Vice Forthcoming

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| Eugene Deshane Mitchell, Shayleen Meuchell, *on their own behalf and as next friend of* B.M.,<br><br>          Plaintiffs,<br><br>          v.<br><br>First Call Bail and Surety, Inc.; Allegheny Casualty Company; International Fidelity Insurance Company; the Montana Civil Assistance Group; Michael Ratzburg; Van Ness Baker, Jr.; and Jason Haack.<br>          Defendants. | Case No.<br><br><br>**COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND REQUEST FOR JURY TRIAL**<br><br>**JURY DEMAND** |

## I.   PRELIMINARY STATEMENT

1.      Late at night in spring 2017, a military-style assault team kicked in the front door of the home of Eugene Mitchell and Shayleen Meuchell. With weapons drawn, several people entered the couple's bedroom to find Mr. Mitchell and Ms. Meuchell in bed with their four-year-old daughter, B.M. The family was terrified to find a group of strangers pointing guns at them. The intruders were not police officers or soldiers; they were private-citizen bounty hunters who claimed authority to arrest Mr. Mitchell due to a forfeited bail bond.

2.      Three months earlier, Mr. Mitchell entered into a private bail bond agreement as he faced two charges: driving with a suspended license and without proof of insurance. Five of the six bounty hunters present for the break-in have since been charged with assault with a weapon, aggravated burglary, unlawful restraint, accountability for aggravated burglary, and criminal mischief related to this incident. Four have pled guilty to counts of criminal endangerment, unlawful restraint, or criminal trespass.

3.      In Montana and throughout the country, private companies profit off of presumptively innocent people who cannot afford to pay an upfront money bond requirement to secure their freedom. These companies impose financial, physical, and personal harms—including invasion of privacy, stigmatization, and burdens on family members—on the persons with whom they contract, yet they generally evade

accountability. Eugene Mitchell and his family, like countless others, were subjected to such harms.

4.    In January 2017, Mr. Mitchell faced an accusation of driving with a suspended license and failure to carry proof of insurance. He could not pay a $1,670 bond required to bail out of jail, return to his family and work, and await his day in court.

5.    Faced with the choice between remaining incarcerated or entering a lopsided agreement with a private, for-profit company, Mr. Mitchell and his family paid a bond premium to Defendants First Call Bail and Surety, Inc., a local bonding agency, and Michael Ratzburg, a bail bondsman and the owner of First Call, to secure Mr. Mitchell's release. Defendants Allegheny Casualty Company, an insurance company that backs bail bonds, and International Fidelity Insurance Company, another insurance company dealing in bail bonds, were sureties on the bond.

6.    On January 4, 2017, Mr. Mitchell and his wife, Shayleen Meuchell, entered into an agreement with First Call, Ratzburg, Allegheny, and International Fidelity (referred to here as the Bond Company Defendants). Mr. Mitchell and Ms. Meuchell paid a non-refundable $228 premium in exchange for the Bond Company Defendants posting Mr. Mitchell's full $1,670 bond. *See* Mitchell Bail Bond Agreement, Ex. A.

7.     The agreement reserved for the Bond Company Defendants considerable power to, *inter alia*, unilaterally change the terms of the agreement or use physical force to apprehend and arrest Mr. Mitchell as the companies saw fit. Mr. Mitchell was incarcerated when Ratzburg discussed the agreement with Ms. Meuchell. Ratzburg gave Ms. Meuchell only a few minutes to read the agreement, and Mr. Mitchell had no opportunity to review its terms.

8.     On April 19, 2017, Mr. Mitchell inadvertently failed to appear for a court hearing, and the court forfeited his bond. On April 21, 2017, Ratzburg and First Call hired Van Ness Baker, Jr., Vice President of an organization called the Montana Civil Assistance Group (MCAG), to arrest Mr. Mitchell.

9.     Defendant MCAG through its leadership, Defendants Jason Haack and Van Ness Baker, deployed several of its members—Skylar Reese-Bamford, Keegan Crick, Maria Miller, Larry Wallace, and Jessie White—to spend the following days searching for Mr. Mitchell. MCAG members staked out the home of Mr. Mitchell and Ms. Meuchell throughout the weekend, including by parking vehicles on or near the premises and by driving loudly on streets adjacent to the house throughout the night, such that Ms. Meuchell was aware she was being watched. When an acquaintance came by the home to see Ms. Meuchell, MCAG members surrounded the visitor's car with guns drawn for approximately fifteen or twenty minutes, asking

questions about Mr. Mitchell's whereabouts and intimidated the driver and her teenaged daughter.

10.    On April 23, 2017, at least five MCAG members—Baker, Reese-Bamford, Crick, Miller, and Wallace—kicked in Mr. Mitchell and Ms. Meuchell's front door and stormed into their home with weapons drawn. Mr. Mitchell, Ms. Meuchell, and their four-year-old daughter B.M. were all asleep in bed. MCAG members pointed guns at the family, told everyone not to move, took Mr. Mitchell to another room, handcuffed and arrested him, and then drove him to the Ravalli County jail approximately one hour away. Mr. Mitchell, Ms. Meuchell, and B.M. were terrified by the experience.

11.    As a result of the attack, all three Plaintiffs have suffered physical and emotional injuries. They also suffered damage to their front door, which has substantially increased the cost of their heat and electricity. The attack left Ms. Meuchell traumatized and uncomfortable being at home without Mr. Mitchell. Plaintiff B.M. is similarly traumatized and has difficulty sleeping. She also runs and hides whenever someone comes to the family's door.

12.    Plaintiffs bring this action against Defendants to remedy violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and the Montana Consumer Protection Act, Mont. Code Ann. § 30-14-103. Plaintiffs also bring claims against Defendants for trespass, false imprisonment, assault, intentional

infliction of emotional distress, and negligent infliction of emotional distress. Plaintiffs seek monetary damages, punitive damages, declaratory relief, attorneys' fees, and costs.

## II.    JURISDICTION AND VENUE

13.    The Court has jurisdiction over this action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c), and 28 U.S.C. § 1331.

14.    The Court has supplemental jurisdiction over claims arising under state law under 28 U.S.C. § 1367.

15.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## III.    PARTIES

16.    Plaintiff Eugene Deshane Mitchell resides in Lolo, Montana. He is the husband of Plaintiff Shayleen Meuchell and the father of Plaintiff B.M.

17.    Plaintiff Shayleen Meuchell resides in Lolo, Montana. She is the wife of Plaintiff Eugene Mitchell and the mother of Plaintiff B.M.

18.    Plaintiff B.M. is a minor child whose parents are Plaintiffs Mitchell and Meuchell. B.M. resides in Lolo, Montana.

19.     Defendant First Call Bail and Surety, Inc. is a Montana corporation licensed under the laws of the State of Montana with its principle place of business at 2419 Mullan Road, Suite H, Missoula, MT 59808.[1]

20.     Defendant Michael Ratzburg is the owner and operator of First Call Bail and Surety, Inc. Before opening First Call, Ratzburg owned at least one other bail bonding companies, Grizzly Bail. Ratzburg resides in Missoula, Montana.

21.     Defendant International Fidelity Insurance Company is a New Jersey corporation, with its principal place of business in California.

22.     Defendant Allegheny Casualty Company is a New Jersey corporation with its principal place of business in California. Allegheny is a subsidiary of International Fidelity.[2]

23.     AIA Holdings, Inc. is a corporation made up of Defendant Allegheny Casualty, Defendant International Fidelity, and a third company, Associated Bond. AIA is self-described as the nation's "oldest and largest family of bail bond

---

[1] The Montana Insurance Commissioner lists an alternate potential address for First Call: 400 West Broadway, Suite 101-412, Missoula, MT 59802.

[2] For example, in its 2018 annual financial statement, Allegheny lists www.ific.com as its website. Allegheny Casualty Company, *Annual Statement for the Year 2018 of Allegheny Casualty Company*, 1 (Feb. 22, 2019), https://interactive.web.insurance.ca.gov/sdrive/companyprofile/2018/propertyAndCasualty/annu al/13285.2018.P.AN.PK.O.M.3668249.pdf.

insurance companies." AIA is a California corporation with its principal place of business in California.

24.     Under a Managing General Agent agreement between AIA and International Fidelity, AIA engages in all bail bonds marketing and underwriting on behalf of the Allegheny, International Fidelity, and Associated Bond consortium.[3]

25.     Defendant Montana Civil Assistance Group is a not-for-profit organization registered under section 501(c)(4) of the Internal Revenue Code and domiciled at 745 Dry Gulch Road, Stevensville, MT 59870.

26.     Defendant Van Ness Baker, Jr. is the Vice President and co-founder of the Montana Civil Assistance Group and a resident of Stevensville, Montana.

27.     Defendant Jason Haack is the President and co-founder of the Montana Civil Assistance Group and a resident of Colombia, South America.

## IV.   STATEMENT OF FACTS

**A.    Mr. Mitchell and Ms. Meuchell contracted with private bond companies to ensure Mr. Mitchell's release from jail.**

28.     On January 4, 2017, Eugene Mitchell was in jail accused of Failure to Carry Proof or Exhibit Insurance (2nd) and Driving While License Suspended or Revoked. The maximum penalty for the charge of failure to carry proof of or exhibit

---

[3] N.J. Comm'r of Banking & Ins., Report on Examination as to the Condition of the Allegheny Casualty Company, 5 (2017), https://www.nj.gov/dobi/division_insurance/solvency/finexam_rpt13285allegheny2015.pdf.

insurance was a fine of $350. Mont. Code Ann. § 61-6-304. The maximum penalty for the charge of driving while license suspended or revoked was a $500 fine or six months' incarceration. Mont. Code Ann. § 61-5-212.

29.     In January 2017, Mr. Mitchell was employed doing concrete work. He was supporting his wife, Shayleen Meuchell, and their two children. The bond set for his release was $1,670.[4] Mitchell and his family could not afford to pay the full bond amount.

30.     To secure his release from jail, Mr. Mitchell entered into a bail bond agreement with International Fidelity and Allegheny through a bondsman, Michael Ratzburg of First Call. Ms. Meuchell, as an indemnitor, was also party to the agreement. Neither Ms. Meuchell nor Mr. Mitchell had an adequate opportunity to review the terms of the bond agreement, which was not subject to negotiation.

31.     Ratzburg agreed that Mr. Mitchell and Ms. Meuchell could pay their $228 bond premium—a nonrefundable deposit paid in exchange for the Bond Company Defendants posting and guaranteeing the full bond—in two installments of approximately $115.[5] Ms. Meuchell paid $115 in person on January 4, 2017, and

---

[4] It is possible that a prior failure to appear bench warrant was factored into this bail amount.
[5] Defendant Ratzburg often allowed clients to pay deposits on their bail bonds in installments.

the remaining $115 at a Wheat Montana sandwich shop approximately one week later.[6]

32.    During a brief exchange that occurred when Mr. Mitchell was released from jail, Ratzburg threatened that if Mr. Mitchell did not pay the outstanding amount due on his premium or comply with the bond agreement, Ratzburg would "get" him.

33.    After his release, Mr. Mitchell inadvertently failed to appear for a court hearing on April 19, 2017.

34.    That same day, a Ravalli County Justice of the Peace issued a Notice of Bond Forfeiture to First Call and Michael Ratzburg.

35.    Although Montana law requires notice of any bond forfeiture to be mailed to both the bond company and the accused individual, Montana Code § 46-9-503, Mr. Mitchell did not receive notice of the forfeiture.

36.    On April 21, 2017, two days after Mr. Mitchell's failure to appear, Ratzburg issued his own "Revocation of Bond" on behalf of First Call and International Fidelity. The revocation of bond form that Ratzburg filed listed the bond amount as $1,000.[7]

---

[6] Though the bail agreement lists Mr. Mitchell's deposit as $228, Mr. Mitchell and Ms. Meuchell paid $230 total through these two $115 installments. The reason for this discrepancy is unclear.
[7] It is unclear why Ratzburg's Revocation of Bond documents listed the amount as $1,000, which is less than the $1,670 bond amount listed in the bond agreement.

**B.    Ratzburg and First Call authorized bounty hunting by MCAG and its members.**

37.    On April 21, 2017, Ratzburg, on behalf of First Call, also issued a document entitled "Arrest of Defendant on Bail Bond." In that document, Ratzburg, as owner of First Call, did "authorize and empower Van Ness Baker it's [sic] representative and its stead, to arrest and detain" Mr. Mitchell.

38.    The document authorized Van Ness Baker, Vice President of MCAG, to seize Mr. Mitchell and surrender him to the Ravalli County jail on Ratzburg's behalf. Van Ness Baker acted as the authorized agent of Ratzburg and First Call in directing and participating in MCAG's arrest and detention of Mr. Mitchell. Baker and Haack coordinated the MCAG's operation pursuant to the authority granted by Ratzburg and First Call.[8]

39.    Ratzburg told MCAG that Mr. Mitchell owed half of his bond premium, or $115. But Mr. Mitchell and Ms. Meuchell had already paid Ratzburg the full bond premium in two payments: one at the jail when Ms. Meuchell signed the bond agreement and one the following week, paid in cash at a Wheat Montana sandwich shop.

---

[8] A separate document executed between Ratzburg and MCAG authorized MCAG to apprehend Mitchell in exchange for payment. *See* "Bail Fugitive Recovery Payment Agreement," Defendant's Motion to Dismiss at 18–19, *State of Montana v. Van Mitchell Baker*, Mont. 4th Jud. Dist., No. DC-17-588, (March 29, 2019).

40.     MCAG was established on August 31, 2015. MCAG is organized into battalions and companies with a chain-of-command structure modeled on the military. MCAG recommends that its members carry AR-15 type rifles to be the "last line of defense against any threat" to our nation.

41.     At the time Ratzburg contracted with Baker, Baker was a co-owner and Vice President of MCAG, and Defendant Jason Haack ran the organization, served as its President, and gave all directives for MCAG activities.

42.     MCAG engages in the apprehension, arrest, and surrender of individuals out on private bail bonds—an activity commonly known as "bounty hunting." During its nearly four-year history, MCAG has recruited bounty hunters in Montana, Arizona, Utah, Nevada, and Idaho.

43.     In an online recruitment posting, MCAG said: "[We are] employed by bail bondsmen; we are usually paid about 10% of the total bail amount, but this commission can vary on an individual, case-by-case basis; usually depending upon the difficulty level of the assignment and the approach used to exonerate the bail bond."[9]

---

[9] *See also* Eric Granof, *To Catch a Fugitive*, AIA Surety Bail Bond Blog (May 27, 2011), https://www.aiasurety.com/bail-bond-blog/to-catch-a-fugitive/ ("Hired by bail bondsmen, bounty hunters typically earn 10 percent of a bail bond . . . So if someone jumps on a $5,000 bond and a bounty hunter nabs him, he would earn about $500 for that capture.").

44.     MCAG previously operated under the name the Montana Minutemen.

45.     Between April 21, 2017 and April 23, 2017, MCAG members staked out the home of Mr. Mitchell and Ms. Meuchell while others went to businesses that Mr. Mitchell frequented.[10]

46.     On April 21, MCAG member Skylar Reese-Bamford knocked on the door of Mr. Mitchell and Ms. Meuchell's home. Ms. Meuchell answered with her two young children. Ms. Reese-Bamford did not identify herself as an MCAG member or tell Ms. Meuchell there was a Notice of Bond Forfeiture for Mr. Mitchell. Instead, Ms. Reese-Bamford said she was looking for Jerry Winkel. Ms. Meuchell responded by saying she didn't know anyone by that name.

47.     Ms. Reese-Bamford left, only to return a short time later and knock again. This time, Ms. Reese-Bamford asked whether Eugene Mitchell was home. Ms. Meuchell said he wasn't.

48.     As Ms. Reese-Bamford drove away, Ms. Meuchell noticed that the car emitted a loud sound, like the vehicle had lost its muffler. For the next several hours and into the evening, Ms. Meuchell could hear the car driving on the roads adjacent to the couple's home. Ms. Meuchell found the experience troubling, as it seemed the woman who'd come to her door was monitoring the house. Ms. Meuchell was

---

[10] During one such visit on April 22, 2017, three MCAG members got into an altercation with the owner the Bum Steer bar.

concerned for Mr. Mitchell's safety, as it was clear to her that these strangers were looking for him, and she did not understand why.

49.    On the evening of April 21, 2017, Majesta Larocque and her 16-year-old daughter came to Mr. Mitchell's residence to collect money owed for babysitting one of the children of Mr. Mitchell and Ms. Meuchell. When Ms. Larocque pulled into Mr. Mitchell and Ms. Meuchell's driveway, two cars rapidly approached and blocked Ms. Larocque's exit. The group—including Defendant Baker and MCAG members Miller, Crick, and Reese-Bamford—approached the vehicle wearing body armor and pointed guns at the car. The group questioned Ms. Larocque about Mr. Mitchell's whereabouts for 15–20 minutes. Ms. Larocque and her daughter were very frightened by this experience.

**C.    MCAG forcibly entered the home of Mr. Mitchell and Ms. Meuchell on April 23, 2017.**

50.    At approximately 9:20 p.m. on April 23, 2017, Mr. Mitchell, Ms. Meuchell, and their then four-year-old child, B.M., were all in bed in their pajamas. They heard a loud bang as their door was kicked in and at least five armed men and

women—Defendant Baker and MCAG members Crick, Miller, Wallace, and Reese-Bamford—entered their home, directed by Defendant Haack.

51.     While Crick, Baker, Miller, and Reese-Bamford stormed into the bedroom, White and Wallace stood guard in the living room and street, respectively.

52.     The MCAG members were wearing body armor with badges resembling Sheriff's badges. Everyone in the group was carrying firearms. Defendant Baker and Jesse White were carrying assault rifles.

53.     A Field Report generated by MCAG members who participated in the attack reflects that they knew there was at least one child in the home when they broke in. Indeed, Ms. Reese-Bamford saw the children when she knocked on the family's door two days earlier. MCAG members also reported seeing Ms. Meuchell through the window at approximately 8:00 p.m. before they entered.

54.     Crick, Baker, Miller, and Reese-Bamford found Mr. Mitchell, Ms. Meuchell, and B.M. in the bedroom. Defendant Baker pointed his assault rifle at the family and told Mr. Mitchell to come with him to the living room so B.M. would not have to see the arrest.

55.     Mr. Mitchell cooperated with the bounty hunters, who took him outside and "arrested" him. According to the MCAG Field Report, Haack called Ratzburg during the attack to notify Ratzburg that "the team was securing Mitchell." Ratzburg

responded by saying he would "email [Haack] the amount for the invoice" the following day.

56.    The bounty hunters arrived at the Ravalli County Detention Center (RCDC) with Mr. Mitchell at approximately 10:20 p.m. and requested that Mr. Mitchell be jailed.

57.    Though the bounty hunters had the petition to revoke bail from Ratzburg, they did not have an arrest warrant signed by a judge. The RCDC refused to accept Mr. Mitchell into custody because MCAG lacked authority to arrest him.

58.    A bondsman named Jeff Carter of Lucky Bail Bonds, arrived at the jail around 10:35 p.m. MCAG's members handed Mr. Mitchell over to Mr. Carter, who cuffed Mr. Mitchell and continued detaining him, allegedly due to a debt that Mr. Mitchell owed Lucky Bail Bonds.

59.    At approximately 10:45 p.m., two Ravalli County Sheriff's deputies, one identified by MCAG as Officer Neimeyer, arrived at the RCDC. Because MCAG lacked valid arrest authority, Officer Neimeyer began to work up an unlawful detainment charge against Defendant Baker and the other bounty hunters around 11:25 p.m.

60.    Officers from the Hamilton Police Department responded to calls to the RCDC at approximately 11:30 p.m. The Hamilton Police Department discovered

there was a Montana Highway Patrol Warrant for Mr. Mitchell's arrest, and he was taken into custody at 11:39 p.m.

61.     After jailing Mr. Mitchell, Hamilton Sheriff Stephen Holton confronted the MCAG members about attempting to surrender Mr. Mitchell without legal authority. Sheriff Holton told the bounty hunters that "if there hadn't been a warrant for Mitchell [they] would all be in jail" and that the "Ravalli County Jail is off limits" to MCAG members for surrenders.

62.     The individual bounty hunters did not know on what authority they seized, arrested, and surrendered Mr. Mitchell. Mr. Crick indicated in a subsequent interview with law enforcement that he thought his involvement in MCAG made him a peace officer. Similarly, Ms. Reese-Bamford was confused about whether MCAG was a private entity or a government agency and had no idea what authority MCAG purportedly had to make arrests or use force. Defendant Baker did not know what purportedly gave him authority to kick in Mr. Mitchell and Ms. Meuchell's door and enter with assault rifles drawn. He explained that he was just following orders of Defendant Haack, who gives all directives for the group. Baker

acknowledged to law enforcement that it was a lapse of judgment to carry the rifle into the home.

**D.    Mr. Mitchell, Ms. Meuchell, and B.M. suffered injuries as a result of this attack.**

63.    B.M. was severely traumatized by the attack. She has difficulty sleeping and has woken up in the middle of the night to ask her parents to confirm the door is locked. Every time someone knocks on the door, she runs and hides. She is also visibly bothered by her brother's toy guns. B.M. has been in therapy to cope with some of these symptoms.

64.    Since the break-in, neither Mr. Mitchell nor Ms. Meuchell feel safe in their own home. Ms. Meuchell gets nervous when Mr. Mitchell is away.

65.    The family's front door has been damaged since April 2017, which presents a security risk and has led to increased utility bills. The family does not have the financial resources to repair the door, which is estimated to cost approximately $2,000.

**E.    When American courts require money bail to secure pretrial release, the for-profit bail bond industry benefits.**

1.    <u>History</u>

66.    The importance of maintaining liberty while a person is accused but not convicted of a crime dates back to the Magna Carta and early forms of habeas

18

corpus.[11] The American bail system borrowed many of its concepts from Anglo-Saxon laws and practices. That traditional bail system provided for the notion of a "surety" to pledge to guarantee the future appearance of the accused and payment of any penalty if convicted.[12,13] But a "surety" was typically a friend, neighbor, or family member. The concept of commercial, for-profit sureties—which were not permitted in England—emerged later.[14]

67.    The rise of commercial sureties did not begin until the nineteenth century. Though the precise date is unknown, commentators associate the industry's rise with increased westward expansion.[15] By 1927, a study of the court records of Cook County, Illinois relayed the outsized and abusive role of commercial bondsmen.[16]

---

[11] *See* Caleb Foote, *The Coming Constitutional Crisis in Bail: I and II*, 113 Univ. Pa. L. Rev. 959, 965–67 (1965).

[12] Timothy R. Schnacke, Michael R. Jones & Claire M. B. Brooker, *The History of Bail and Pretrial Release*, Pretrial Justice Inst., 1–2 (Sept. 23, 2010), https://cdpsdocs.state.co.us/ccjj/Committees/BailSub/Handouts/HistoryofBail-Pre-TrialRelease-PJI_2010.pdf.

[13] Further, money bond requirements in the English system were generally required only in the event of a failure to appear—resembling what are referred to as "unsecured" bonds under many modern systems. *Rational and Transparent Bail Decision Making: Moving from a Cash-Based to a Rise-Based Process*, Pretrial Justice Inst. and the MacArthur Found., 11 (March 2012), http://www.safetyandjusticechallenge.org/wp-content/uploads/2015/05/Rational-and-Transparent-Bail-Decision-Making.pdf.

[14] Schnacke et al., *History, supra* note 12, at 6.

[15] Adam Liptak, *Illegal Globally, Bail for Profit Remains in the U.S.*, N.Y. Times, Jan. 29, 2008, at A1; Schnacke et al., *History*, at 7.

[16] Schnacke et al., *History*, *supra* note 12, at 7 (citing Wayne H. Thomas, Jr., *Bail Reform in America* at 13–14 (Univ. CA Press 1977)).

2.  <u>Modern Iterations</u>

68.     Today, only the United States and the Philippines allow private companies to operate as bond sureties.[17] The use of a commercial, for-profit bail bondsman is now prevalent in Montana and throughout the country.

69.     A commercial bail bondsman enters a private agreement with the arrested individual. To effectuate release from jail, the individual pays a non-refundable premium or fee to the bondsman, and the bondsman agrees to pay the full bond amount in the event that the individual fails to appear.[18] If an individual fails to appear, the court can initiate a forfeiture proceeding such that the full bond amount may be forfeited. But there is typically a grace period during which the individual can re-appear in court or be arrested and under those circumstances, the bond will not be forfeited.

70.     In Montana, forfeiture proceedings can only be initiated when a person fails to appear; forfeiture cannot be based on other pretrial conduct. Mont. Code.

---

[17] Liptak, *supra* note 15.

[18] Timothy Schnacke, Michael R. Jones & Claire M. B. Brooker, *Glossary of Terms and Phrases Relating to Bail and the Pretrial Release or Detention Decision*, Pretrial Justice Inst., 6 (March 11, 2011), https://cdpsdocs.state.co.us/ccjj/Committees/BailSub/Handouts/Glossary_Bail-PretrialRelease_DetentionDecision-PJI_2011.pdf.

Ann. § 46-9-503(2). A surety has 90 days after a failure to appear to "satisfactorily excuse" that failure and retain the bond deposited. Mont. Code Ann. § 46-9-503(3).

71.     Most commercial sureties charge deposits of 10% of the total bond requirement.[19] The bond premium paid to private bondsman is not returned to the individual at the conclusion of the criminal case, even if the individual makes every court appearance, the charges are dropped, or the person is acquitted.

72.     Between 1990 and 2004, the proportion of jail releases in the U.S. involving a private, for-profit surety nearly doubled in felony cases from 24 to 42 percent of cases.[20] Release to a private, commercial surety is now the most common form of pretrial release.[21]

73.     Meanwhile, average bail amounts have risen. The national median for a felony case in 2009 was $10,000, estimated as $11,700 in 2018 dollars.[22] In the Missoula District Court, which handles felonies, the average bail amount in cases

---

[19] Justice Policy Inst., *For Better or For Profit: How the Bail Bonding Industry Stands in the Way of Fair and Effective Pretrial Justice*, 10 (Sept. 2012), http://www.justicepolicy.org/uploads/justicepolicy/documents/_for_better_or_for_profit_.pdf.
[20] Thomas Cohen & Brian Reaves, *State Court Processing Statistics, 1990-2004: Pretrial Release of Felony Defendants in State Courts*, Bureau of Justice Statistics Special Report, NCJ 214994 2 (Nov. 2007), https://www.bjs.gov/content/pub/pdf/prfdsc.pdf.
[21] *Id.*
[22] Thomas Cohen & Brian Reaves, *U.S. State Court Processing Statistics, Felony Defendants in Large Urban Counties, 2009-Statistical Tables*, Bureau of Justice Statistics Statistical Tables, NCJ 243777 19 (Dec. 2013), https://www.bjs.gov/content/pub/pdf/fdluc09.pdf; A recent reports estimates median felony bail at $11,700 in 2018 dollars, Patrick Liu, Ryan Nunn & Jay Shambaugh, *The Economics of Bail and Pretrial Detention*, the Hamilton Project, 19 (December 2018), http://www.hamiltonproject.org/assets/files/BailFineReform_EA_121818_6PM.pdf.

where the individual posted bail was $15,803.87 between 2016 and 2017.[23] In Missoula Justice Court, which handles misdemeanors and other lower-level charges, the average bail amount posted during same period was $5,123.88.

74.    The Federal Reserve estimates that forty-six percent of Americans would be unable to afford an unexpected $400 expense without selling something or borrowing, putting many bail bond requirements out of financial reach for scores of people.[24]

75.    In Montana, commercial bail practices are regulated through insurance codes. *See, e.g.*, Mont. Code Ann. § 33-17-1203(1)(b) (outlining continuing education requirements for insurance producers of surety bail bonds).

### 3.  Bounty Hunting

76.    Bounty hunters, who often refer to themselves as "fugitive recovery agents," are "hired or contracted by a bail bond company or surety to act as their agent for the purpose of locating and apprehending a fugitive that has failed to appear in court or has otherwise violated the bail bond contract or release conditions."[25]

---

[23] This average is based on the Missoula District Court bail register, and excludes the bail amounts in cases where an individual was unable to post the bail amount and remained incarcerated.

[24] Federal Reserve System, *Report on Economic Well-Being of U.S. Households in 2015*, 1 (May 2016) https://www.federalreserve.gov/2015-report-economic-well-being-us-households-201605.pdf.

[25] *FAQ*, National Association of Fugitive Recovery Agents, https://www.fugitive-recovery.org/faq.htm (last accessed April 11, 2019).

77.     Bounty hunting is an abnormally and inherently dangerous activity. Bounty hunters, including MCAG, regularly carry firearms and batons and wear bulletproof vests during their recovery operations. Defendant Baker stated in an interview with law enforcement after the attack that it was MCAG policy to carry guns. And MCAG provided firearms to members, including a shotgun, without any training on safe use or storage.

78.     Bounty hunters frequently point guns at people in the course of their operations, as they did in apprehending Mr. Mitchell. Bounty hunters also frequently break down doors to gain access to the homes of the people they are pursuing, as they did here.

79.     In an interview with law enforcement after the attack on Mr. Mitchell and Ms. Meuchell's home, Larry Wallace stated that he liked the idea of "basically doing the type of work that law enforcement does, because that's what we do, we carry guns, we carry weapons . . . even though we don't have police training . . . ."

80.     Approximately one week before the attack on Mr. Mitchell's home, MCAG pursued a woman named Rebecca Lynn White after she missed a court date. As part of that bounty hunting operation, MCAG surveilled White from across a river in Missoula County. Defendant Baker did this lying on his stomach under a bridge, decked out in camouflage. Lacking binoculars, Baker used the scope mounted on his rifle, which he pointed at White and others. Missoula County

deputies confronted him, determined that the rifle was unloaded, and told him it was illegal to use his rifle-mounted scope in this way. The deputies declined to arrest Baker. Ms. White's bond was $335.

81.    In December 2016, MCAG members broke down the front door of the lodging unit where a man named William Michael Paul Formway was staying. This attack occurred after a standoff that lasted more than four hours overnight.

82.    On December 16, 2016—more than four months before MCAG arrested Mr. Mitchell—Chief Deputy Missoula County Attorney Jason Marks warned Defendant Haack in an email that "[f]orcing a door and entering a residence without consent potentially constitutes criminal mischief and trespass. Bondsman and their agents are not immune from prosecution for crimes committed in the process of apprehending a fugitive. . . . It is certainly possible that other jurisdictions may have some sort of policy that they will not prosecute misdemeanor offenses in the context you outlined in your e-mail. The Missoula County Attorney's Office has no such policy and I would encourage you to modify your practices to avoid potential criminal charges."

83.    In 2016, Ratzburg contracted MCAG members to apprehend one of his bail bonds clients, Dustin McGough. MCAG members entered Mr. McGough's home, displaying firearms, and detained Mr. McGough's family and friends while

they searched the home. Mr. McGough's wife was present when the armed bounty hunters entered his residence.

84.    In 2016, Ratzburg contracted MCAG members to apprehend Kathryn Dutton, a young woman who Ratzburg indicated owed him $150 on her bond. MCAG members deceived Ms. Dutton and, after seizing and apprehending her, brought her to Ratzburg's office in Missoula in an effort to extort payment before surrendering her to the jail.

85.    MCAG engaged in bounty hunting as often as once a week between September 2015 and April 2017, primarily on behalf of bail bonds agents in the Missoula area.

86.    In 2017, a bounty hunter in Great Falls, Montana was accused of pointing a pistol at three children while searching for an individual.[26]

87.    In February 2019, Jason Marks, Chief Deputy County Attorney for Missoula County testified before the Montana Legislature: "We had previous issues with armed bounty hunters . . . [taking actions such as] pulling young baby sitter over while armed to gain intelligence on someone else . . . ."[27]

---

[26] Seaborn Larson, *Bounty Hunter Accused of Pointing Pistol at Girls*, Great Falls Tribune, Sept. 25, 2017, https://www.greatfallstribune.com/story/news/crime/2017/09/25/bounty-hunter-accused-pointing-pistol-girls/701572001/.

[27] *Generally Revise Laws Regarding Bail Bonds: Hearing on S.B. 273 Before Senate Judiciary Committee*, Montana State Senate, 66th Legislature, Feb. 21, 2019, at 09: 43: 50.

88.     Also in February 2019, Detective Captain David Conway with the Missoula County Sheriff's Department testified that his office is aware of bounty hunters kicking down the door of a person uninvolved in any fugitive recovery and engaging in traffic stops while armed to gain "intelligence" on the person they were seeking to apprehend.[28] Detective Conway stated that many bounty hunters operate without formal training.[29]

89.     Montana law allows commercial bond sureties to arrest and surrender their principals, Mont. Code. Ann. § 46-9-510, including through bounty hunters. Montana is one of seventeen states that does not impose a license requirement or otherwise regulate the practice of bounty hunting.[30]

**F.     Large insurance companies fund and reap the profits from the for-profit bail bond industry.**

90.     There are approximately 25,000 individual bail bond agents nationwide, but the majority of their business is underwritten by only nine insurance companies, including Defendants Allegheny and International Fidelity as part of

---

[28] *Id.* at 09:46:00.

[29] *Id.* at 09:48: 00.

[30] Daphne Congcong Zhang, *Lax Washington oversight of bounty hunters set stage for mayhem, tragedy*, The Seattle Times, last updated Jan. 16, 2019, https://www.seattletimes.com/seattle-news/times-watchdog/high-adrenaline-bounty-hunter-industry-operates-with-little-oversight-despite-concerns-over-training-tactics/.

AIA Holdings, Inc.[31] In total, insurance companies secure an estimated $14 billion in bail bonds and earn an estimated $1.4 to $2.4 billion each year.[32]

91.     Bail insurance is often part of the portfolio of much larger corporations, including IAT Insurance Group, a "privately owned, specialty insurance company providing property and casualty products for businesses and individuals."[33] In April 2018, IAT acquired IFIC Surety Group, Inc. The acquisition closed on February 27, 2019, with IAT paying $24.8 million for The Chestnut Group, Inc., which fully owns Allegheny.[34] As noted in the press release announcing the acquisition, "IFIC Surety Group consists of International Fidelity Insurance Company and its subsidiary Allegheny Casualty Company."[35] Members of the Board of Directors of IFIC Group also own 56.66% of AIA Holdings, which serves as "a managing general agent for the Company's bail business."[36]

---

[31] Color of Change & ACLU, *Selling Off Our Freedom: How insurance corporations have taken over our bail system*, 6–7, 22 (May 2017), https://www.aclu.org/sites/default/files/field_document/059_bail_report_2_1.pdf.
[32] *Id.* at 9–10.
[33] IAT Insurance Group, *News Release: IAT Insurance Group to Acquire IFIC Surety Group, Inc.*, https://www.iatinsurancegroup.com/about-us/news/2018/04/03/iat-insurance-group-to-acquire-ific-surety-group-inc (last visited April 11, 2019).
[34] International Fidelity Insurance Company, *Annual Statement for the Year 2018 of the International Fidelity Insurance Company*, 26 (Feb. 22, 2019), https://interactive.web.insurance.ca.gov/sdrive/companyprofile/2018/propertyAndCasualty/annual/11592.2018.P.AN.PK.O.M.3668030.pdf.
[35] IAT Insurance Group, *News Release*, *supra* note 33.
[36] N.J. Comm'r of Banking & Ins., Report on Examination as to the Condition of the International Fidelity Insurance Company, 3 (2017), https://www.nj.gov/dobi/division_insurance/solvency/finexam_rpt11592interfidelity2015.pdf.

92.     According to International Fidelity's 2016 Annual Statement, bail contracts accounted for 13.6% of "company's total direct and assumed premium for 2016."[37]

93.     Allegheny "earns bail premium on the first day the bond is issued," as a permitted departure from the standard practice prescribed by the National Association of Insurance Commissioners.[38] This exception to the regular rules of the NAIC added an additional $2,043,018 (net of taxes) to Allegheny's surplus in 2017 and an additional $2,576,219 in 2018.[39]

94.     International Fidelity also "earns bail premium on the first day bond is issued," as a permitted departure from the standard practice prescribed by the National Association of Insurance Commissioners.[40] This exception to the regular rules of the NAIC added an additional $1,089,974 (net of taxes) to International Fidelity's surplus in 2017 and an additional $1,310,834 in 2018.[41]

---

[37] International Fidelity, Management's Discussion and Analysis of Financial Condition and Results of Operations Annual Statement for the Year Ending December 31, 2016, 2 (March 23, 2017), https://www.ific.com/wp-content/uploads/2017/05/IFIC-MDA-2016-Final-Revised.pdf.
[38] Allegheny *Annual Statement for the Year 2018*, *supra* note 2, at 14.
[39] *Id.*
[40] International Fidelity, *Annual Statement for the Year 2018*, supra note 34, at 14.
[41] *Id.*

95.    In 2018, Allegheny underwrote $825,225,175 in bail bond values across the country, earning itself and its bail agents $29,811,250 before brokerage expenses.[42]

96.    In 2018, International Fidelity underwrote $894,074,875 in bail bond values across the country, earning itself and its bail agents $15,040,861 before brokerage expenses.[43]

97.    The bail bond portion of most insurers' portfolios, including those affiliated with and managed by AIA Holdings, operates with minimal risk because individual bail agents absorb any losses.[44] AIA Holdings acknowledges that bail agents are responsible for any forfeitures or other such losses and because of this, AIA "sustained no losses on this book of business in 2015 and 2014."[45] In 2013,

---

[42] Allegheny Casualty Company, *Supplement for the Year 2018 of the Allegheny Casualty Company, "Bail Bond Supplement,"* 94 (Feb. 22, 2019), https://interactive.web.insurance.ca.gov/sdrive/companyprofile/2018/propertyAndCasualty/annual/13285.2018.P.AN.PO.O.M.3668250.pdf.

[43] International Fidelity Insurance Company, *Supplement for the Year 2018 of the International Fidelity Insurance Company, "Bail Bond Supplement,"* 97 (Feb. 22, 2019), https://interactive.web.insurance.ca.gov/sdrive/companyprofile/2018/propertyAndCasualty/annual/11592.2018.P.AN.PO.O.M.3668031.pdf.

[44] *See Selling Off Our Freedom*, *supra* note 31, at 24. This lower risk assumed when an insurer underwrites bail bonds is reflected in the fact that Allegheny reinsures its business with International Fidelity, except for Allegheny's bail bonds portfolio. N.J. Audit, Report on International Fidelity, *supra* note 36, at 3.

[45] Allegheny Casualty Company, International Fidelity Insurance Company, *Management Discussion and Analysis of Financial Condition and Results of Operations for the year ending December 31, 2015*, (March 23, 2016), https://interactive.web.insurance.ca.gov/sdrive/companyprofile/2015/propertyAndCasualty/annual/13285.2015.P.AN.PM.O.A.3107706.pdf.

AIA's chief legal officer stated, "You know how many checks this company has written to pay a bail loss? Not a single one."[46]

98.     In 2016,[47] 2017,[48] and 2018,[49] Allegheny did not experience any losses related to its bail portfolio.

99.     In 2016,[50] 2017,[51] and 2018,[52] International Fidelity did not experience any losses related to its bail portfolio.

---

[46] Shane Bauer, *Inside the Wild, Shadowy, and Highly Lucrative Bail Industry*, Mother Jones (May/June 2014), https://www.motherjones.com/politics/2014/06/bail-bond-prison-industry/.
[47] Allegheny Casualty Company, *Supplement for the Year 2016 of the Allegheny Casualty Company, "Bail Bond Supplement,"* 84 (Feb. 23, 2017), https://interactive.web.insurance.ca.gov/sdrive/companyprofile/2016/propertyAndCasualty/annu al/13285.2016.P.AN.PO.O.M.3267514.pdf.
[48] Allegheny Casualty Company, *Supplement for the Year 2017 of the Allegheny Casualty Company, "Bail Bond Supplement,"* 80 (Feb. 23, 2018), https://interactive.web.insurance.ca.gov/sdrive/companyprofile/2017/propertyAndCasualty/annu al/13285.2017.P.AN.PO.O.M.3459353.pdf
[49] Allegheny, *Supplement for the Year 2018*, *supra* note 42, at 93.
[50] International Fidelity Insurance Company, *Supplement for the Year 2016 of the International Fidelity Insurance Company, "Bail Bond Supplement,"* 91 (Feb. 23, 2017), https://interactive.web.insurance.ca.gov/sdrive/companyprofile/2016/propertyAndCasualty/annu al/11592.2016.P.AN.PO.O.M.3267378.pdf.
[51] International Fidelity Insurance Company, *Supplement for the Year 2017 of the International Fidelity Insurance Company, "Bail Bond Supplement,"* 87 (Feb. 23, 2018), https://interactive.web.insurance.ca.gov/sdrive/companyprofile/2017/propertyAndCasualty/annu al/11592.2017.P.AN.PO.O.M.3458908.pdf.
[52] International Fidelity, *Supplement for the Year 2018*, *supra* note 43, at 97.

1. <u>The bounty hunters acted as agents of Ratzburg and First Call and subagents of the insurance companies. Ratzburg and First Call are agents of the insurance companies.</u>

100.    The "Arrest of Defendant on Bail Bond" document that First Call issued to Baker through Ratzburg authorized Baker to arrest and detain Mr. Mitchell as its "representative and its stead."

101.    It was within the scope of authority granted by Ratzburg to Baker and MCAG to "track, locate, identify, arrest, transport, and surrender" Mr. Mitchell.

102.    Ratzburg and First Call acted as the "duly appointed independent bail producer" of International Fidelity and Allegheny when Ratzburg entered into the Bail Bond Agreement with Mr. Mitchell and Ms. Meuchell. Ex. A (Bail Bond Agreement). International Fidelity and Allegheny are defined as the "Surety" parties to the agreement.

103.    When they hired Baker and MCAG to apprehend Mr. Mitchell, Ratzburg and First Call acted within the scope of authority conferred on First Call as a bail producer for International Fidelity and Allegheny.

104.    AIA is the public face of Allegheny and International Fidelity. For example, a Google search for either International Fidelity or Allegheny Casualty directs the user to AIA's website, www.aiasurety.com.

105.    Allegheny and International Fidelity are bound by the public statements of AIA.

31

106.   Through AIA, International Fidelity and Allegheny support the bail producers whose bonds they underwrite.

107.    According to its website, AIA provides bond agents with "24/7 Agent Support."[53]

108.   The site actively encourages visitors to "Become an AIA Agent" by submitting an online form or calling 800.935.BAIL.

109.   AIA also operates www.bailvisionpro.com, an account management program for bail agents to keep track of their clients and the status of various bonds. According to the website, Bail Vision Pro is "powered by AIA."

110.   AIA also operates www.expertbail.com, a website geared towards people seeking a bail bond agent. ExpertBail is "backed by AIA." According to the ExpertBail website, "AIA utilizes a unique 'service- focused' approach to management, that provides its family of agents with the knowledge, tools and commitment they need to grow their business and succeed."[54] This same site indicates that "AIA prides itself on building long-term relationships with its partner

---

[53] Allegheny Casualty, International Fidelity & Associated Bond, https://www.aiasurety.com/about/ (last visited April 11, 2019).
[54] ExpertBail, *ExpertBail's Origin* http://www.expertbail.com/about-expertbail/expertbails-origin (last visited April 11, 2019).

agents that foster trust and confidence."[55] The ExpertBail website also directs users to call 800.395.BAIL.

111.   AIA provides bail agents with a digest of the pertinent laws surrounding bail, forfeiture, and apprehension in every state. Montana's digest is available at https://www.aiasurety.com/montana-bail-resources/.

112.   AIA co-sponsored the Winter 2019 conference of the Professional Bondsman of the United States, a trade organization for bail bond agents. AIA's sponsorship included dinners and other events during the conference.

113.   Allegheny, International Fidelity, and AIA provide the form bail agreements agents use with individual clients. The agreement Ratzburg required Mr. Mitchell and Ms. Meuchell to sign was an AIA form agreement that has also been used in at least Nevada, North Carolina, California, and Texas. AIA requires its agents to use its standard form agreements.

114.   Based on the agreement terms and the Managing General Agent agreement between the insurance companies, Ratzburg and First Call are agents of Allegheny, and International Fidelity.

115.   Allegheny and International Fidelity, through AIA, exercise control over the bail bond agents with whom they work.

---

[55] *Id.*

116.   To become an authorized bond agent through AIA, the bondsman must complete a two-part application that includes disclosure of criminal records, financial information, and assets.[56]

117.   Allegheny and International Fidelity, as well as AIA, determine the amount of bail bonds a given agent is authorized to write. A bond agent is authorized to write higher bond amounts as a result of developing credit with AIA, International Fidelity, and Allegheny.

118.   Allegheny and International Fidelity, as well as AIA, set the financial terms of the relationship through producer agreements, under which bail bond agents absorb the losses for any bail bonds that are forfeited. As a result, individual bail bond agents are liable for the losses resulting from any bond forfeitures, which they pay either directly or through a fund—known as the "build-up fund"—into which the bond agents themselves make deposits.

119.   Build-up funds are set up to lower financial risks to Allegheny, International Fidelity, as well as AIA. The assets in the build-up fund are in addition to the regular expenses and losses—including through forfeiture—that bail agents are expected to cover themselves.

---

[56] *Become an AIA Agent*, https://becomeanagent.aiasurety.com/contact/ (last visited April 11, 2019).

120.   At the end of 2018, Allegheny's build-up fund had $17,273,512 in assets.[57]

121.   At the end of 2018, International Fidelity's build-up fund had $23,491,214 in assets.[58]

122.   Allegheny and International Fidelity, through AIA, exercise control over bond agents through public relations efforts. A blog post by AIA's Vice President of Corporate Communications, Eric Granof, notes that "AIA travels the country and talks with bail agents, including in how to 'put our best foot forward.'"[59]

123.   The AIA ExpertBail network was "created to separate the high quality bail bond agent from the low quality bail bond agent."[60]

124.   Allegheny and International Fidelity are aware that bounty hunting or fugitive recovery practices are a part of the for-profit bond economy.

125.   For example, Eric Granof, Vice President of Corporate Communications for AIA, wrote in an article for USA Today: "Fugitive recovery

---

[57] Allegheny, *Supplement for the Year 2018*, *supra* note 42, at 93.
[58] International Fidelity, *Supplement for the Year* 2018, *supra* note 43, at 97.
[59] ExpertBail, *The Image of Bail:Putting Our Best Foot Forward*, http://www.expertbail.com/resources/bail-industry-news/the-image-of-bail-putting-our-best-foot-forward (last visited April 11, 2019).
[60] ExpertBail, *Why ExpertBail?*, http://www.expertbail.com/about-expertbail/why-expertbail (last visited April 11, 2019).

agents do play an important role in the bail bond process and are a valuable component of what makes the bail process so effective."[61]

126.   A video posted on AIA's ExpertBail website shares the viewpoint that commercial surety bonds are preferable to unsecured money bonds, where an individual only owes a payment in the event of a failure to appear in court. In that video, the speaker states that public policy should weigh against unsecured bonds in part because "where the county is your bail bondsman," if a person fails to appear in court "they don't actually go look for you," as compared to for-profit actors who, through bounty hunting, sometimes seek out and apprehend individual clients. [62]

127.   The AIA Bail Bond Blog characterizes bounty hunting as a common practice that "illustrates the forces that come into play when a defendant disappears

---

[61] Eric Granof, *The Truth About These Tough Guys*, USA Today, January 31, 2012, *available at* https://www.expertbail.com/resources/bail-industry-news/the-truth-about-the-bail-bond-profession-what-everyone-should-know (last visited April 11, 2019).

[62] ExpertBail, *Setting the Record Straight on the Real Cost of PR Bonds*, http://www.expertbail.com/resources/bail-industry-news/setting-the-record-straight-on-the-real-cost-of-pr-bonds, at 7:45. In fact, methodologically sound empirical evidence demonstrates that unsecured bonds are just as effective as secured bail bonds at assuring court appearances and avoiding arrest during the pretrial release period. *See* Michael R. Jones, *Unsecured Bonds: The as Effective and Most Efficient Pretrial Release Option*, Pretrial Justice Inst., (October 2013), https://pdfs.semanticscholar.org/5444/7711f036e000af0f177e176584b7aa7532f7.pdf; *see also Schultz v. State*, 330 F. Supp. 3d 1344, 1362 (N.D. Ala. 2018) (Finding "secured money bail is not more effective than unsecured bail or non-monetary conditions of release in reducing the risk of flight from prosecution."); *ODonnell v. Harris Cty., Texas*, 251 F. Supp. 3d 1052, 1068 (S.D. Tex. 2017), *aff'd as modified*, 882 F.3d 528 (5th Cir. 2018), and *aff'd as modified sub nom.*, *ODonnell v. Harris Cty.*, 892 F.3d 147 (5th Cir. 2018) ("[T]he reliable record evidence shows that release on secured money bail does not mitigate those risks for misdemeanor defendants better than release on unsecured or nonfinancial conditions, in Harris County or elsewhere.").

while out on bail and *a pile of cash is at stake*."[63] The blog continues: "If the defendant flees, the bonding company stands to lose the [full amount of bond posted.] To recoup the loss, it can . . . hire a bail enforcement agent—sometimes called a bounty hunter—to track down the defendant before the bond forfeiture hearing."

128.   By making individual bail bondsman liable for any forfeiture losses, Allegheny and International Fidelity incentivize their bondsmen agents like Ratzburg to hire aggressive bounty hunters or to undertake aggressive bounty hunting activity themselves.

129.   Eric Granof of AIA has acknowledged these incentives directly. In his article for USA Today, Granof noted:

> If [a bail bondsman's client] fails to make a single appearance, it is the bail agent's responsibility to remand (the legal term for "return") the defendant back into custody. However, if the defendant does not show up to court for any reason whatsoever and is not remanded, the bail agent becomes responsible for the full amount of the bond, which, in this [illustrative] case, is $10,000.
>
> As one can well imagine, the motivation to ensure the appearance of any defendant is extremely important to a bail agents' [sic] survival. Receiving $1,000 for a service and then having to pay $10,000 back if you do not do your job is strong motivation. Depending on the size of

---

[63] Eric Granof, *Bail Bond Firm Saves $200,000 by Capturing Fugitive*, AIA Bail Bond Blog (June 6, 2011), https://www.aiasurety.com/bail-bond-blog/bail-bond-firm-saves-200000-by-capturing-fugitive/ (emphasis added).

the bond, it only may take one or two bonds going bad to have a material impact on the agent's business . . .

. . . *The powerful financial incentive* that is built into the bail system is what makes the bail bond industry so effective at what it does: getting defendants to show up for court.[64]

130.   Eric Granof reposted an article on the AIA Bail Bond Blog stating, "Whereas police earn a salary no matter who they round up, bounty hunters only get paid if they bring back the defendant. This system gives bounty hunters a greater incentive to catch a fugitive . . . ."[65]

131.   Another AIA Bail Blog post states: "Commercial bail bond agents are financially incented to ensure that defendants show up for court. If someone fails to appear the bail bondsman is ultimately responsible for the full amount of the bond. Law enforcement on the other hand is too busy to go after these types of warrants and typically only make an arrest when the person is picked up for another charge."[66]

## V.   GENERAL RICO ALLEGATIONS

132.   Plaintiffs are "persons" with standing to sue within the meaning of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961(3) and 1964(c).

---

[64] Granof, *supra* note 61 (emphasis added).
[65] Granof, *To Catch a Fugitive*, *supra* note 9.
[66] Eric Granof, *The Effectiveness of Commercial Bail: We Go Get Them*, AIA Bail Bond Blog (May 7, 2014), https://www.aiasurety.com/bail-bond-blog/the-effectiveness-of-commercial-bail-we-go-get-them/.

133.   The Defendants are each a RICO "person" within the meaning of 18 U.S.C. § 1961(3) because each is an entity or individual capable of holding a legal or beneficial interest in property.

## A.   The RICO Enterprises

### 1.   RICO Enterprise of all Defendants

134.   With respect to the predicate acts of extortionate extension of credit and financing extortionate credit transactions, all Defendants have acted in concert and associated together as a distinct association-in-fact. Defendants therefore form an enterprise within the meaning of 18 U.S.C. § 1961(4). Defendants do not operate as completely separate entities in financing and extending credit to bail consumers under threat of violence. Rather, they have an ongoing relationship and share the common purposes of contracting with bail bonds clients, collecting bond deposits, and hunting, seizing, and unlawfully restraining bail bonds clients who either fail to appear or whom Defendants deem a risk of forfeiture or financial loss.

135.   Defendants function as a continuing unit and have so functioned for a sufficient period of time to permit them to pursue the goals of the enterprise. First Call, Ratzburg, Allegheny, and International Fidelity have functioned as a continuing unit since approximately June 2014. In turn, First Call and Ratzburg—as agents of Allegheny and International Fidelity—have employed MCAG since

approximately September 2015 to engage in bounty hunting in order to secure payments, prevent losses, and mitigate risk.

136.   Ratzburg and First Call meet with potential bail clients to extend bail bonds and credit for bail bonding fees on behalf of International Fidelity and Allegheny. Using a contract of adhesion containing three pages of fine print, Ratzburg, First Call, International Fidelity, and Allegheny require principals and indemnitors to agree to extortionate and illegal terms. Through this agreement, these Defendants require principals to consent to possible seizure, apprehension, and rearrest, including with force, in order to post their bond. *See* Mitchell Bond Agreement at 2.[67] Ratzburg and First Call then frequently contract with bounty hunters, including MCAG, that search for, seize, and detain principals to coerce payment of bail bonding fees or to prevent the forfeiture of a bail bond deposit. Ratzburg and First Call pay MCAG 10% of the total value of the bail bond.

137.   Ratzburg, First Call, MCAG, and its members regularly communicate about the status of individual clients.

---

[67] Mr. Mitchell's bond agreement also contemplates (1) that the principal may be considered in breach of his or her obligation to the surety such that the surety may immediately apprehend, arrest, and surrender the principal where, *inter alia*, "there is a material increase in the risk assumed by the Surety (as determined by the Surety in its sole and absolute discretion) . . ."; and (2) that "the Surety may attach a location tracking devise on any vehicle owned or driven by [the principal], at any time, without notice, and monitor the location of the vehicle through any available technology." Bond Agreement at 2, 4.

138.   Through these actions, Defendants facilitate and participate in a pattern of racketeering through predicate acts of extortionate extension of credit and financing extortionate credit transactions. Defendants know and intend that these acts of racketeering will be committed through their participation in the enterprise, and these Defendants have engaged in racketeering activities continuously over a period of nearly two years.

139.   Allegheny, International Fidelity, and AIA provide the policy Ratzburg and First Call use to secure bail bonds with the court. Allegheny, International Fidelity, and AIA's involvement in bail enforcement and collections is memorialized in the bond agreements with each principal as well as a Managing General Agent agreement.

140.   Under the Managing General Agent agreement, AIA Holdings appoints producers, underwrites and issues bonds, bills premiums, collect premiums from agents, and performs claims handling services.

141.   Allegheny, International Fidelity, and AIA require individual bond agents, including Ratzburg and First Call, to absorb the losses resulting from any bail forfeitures and, in so doing, incentivize aggressive bounty hunting practices, including by MCAG.

142.   As outlined above in paragraphs 83–85, these practices are not limited to Mr. Mitchell's experience. Ratzburg and First Call, as agents of Allegheny and

International Fidelity, frequently engaged MCAG, Baker, and Haack to undertake bounty hunting activities. Defendants' racketeering practices extend over multiple years and are a regular way of conducting the ongoing business of MCAG, First Call, Ratzburg, Allegheny, and International Fidelity as well as conducting or participating in the ongoing enterprise.

## 2.  RICO Enterprise of Montana-Based Defendants

143.   With respect to the predicate acts of kidnapping, extortion, extortionate collection of extension of credit, extortionate extension of credit, and financing extortionate credit transactions, MCAG, Baker, Haack, First Call, and Ratzburg have acted in concert and associated together as a distinct association-in-fact and therefore form an enterprise within the meaning of 18 U.S.C. § 1961(4). MCAG, Baker, Haack, First Call, and Ratzburg coordinate their operation of the bond collection and "fugitive recovery" process. This enterprise has an ongoing relationship and shares the common purposes of apprehending bail bonds clients, recovering bond deposits made with a court within the greater Missoula area, and engaging in kidnapping, extortion, the extortionate collection of credit, the extortionate extension of credit, and the financing of extortionate credit transactions to achieve these ends.

144.   MCAG, Baker, Haack, Ratzburg, and First Call are a RICO enterprise and function as a continuing unit. MCAG, Baker, Haack, First Call, and Ratzburg

have functioned as a continuing unit since approximately September 2015, a sufficient period of time to permit them to pursue the goals of the enterprise.

145.   Through a contract of adhesion that contains three pages of fine print, Ratzburg and First Call require principals and indemnitors to agree to extortionate and illegal terms. Ratzburg and First Call also require principals to consent to possible seizure, apprehension, and rearrest, including with force, in order to obtain a posted bond. *See* Mitchell Bond Agreement at 2. A motion to dismiss filed by Defendant Baker in his criminal case asserted that "[t]he standard language of *all contracts* between First Call Bail & Surety and its clients" authorizes apprehension and surrender on the part of the bondsman.[68] Ratzburg and First Call routinely accomplish this by contracting with MCAG, Baker, and Haack, to search for, seize, and detain principals to coerce payment of bail bonding fees or to prevent the forfeiture of a bail bond deposit. Ratzburg and First Call pay MCAG, Baker, and Haack 10% of the total value of the bail bond.

146.   Ratzburg, First Call, MCAG, Baker, Haack and MCAG members regularly communicate about the status of individual clients.

147.   MCAG members work in close concert with one another to perform their bounty hunting activities and keep detailed notes in "field reports."

---

[68] *Baker* Motion to Dismiss, *supra* note 8, at 2 (emphasis added).

148.   As outlined above in paragraphs 83–85 and 142, these racketeering practices are not limited to Mr. Mitchell's experience. They extend over multiple years and are a regular way of conducting the ongoing business of MCAG, Baker, Haack, First Call, and Ratzburg as well as conducting or participating in the ongoing enterprise.

149.   MCAG, Baker, Haack, Ratzburg, and First Call facilitate, and participate in a pattern of racketeering through predicate acts of kidnapping, extortion, extortionate collection of extension of credit, extortionate extension of credit, and financing extortionate credit transactions. MCAG, Baker, Haack, Ratzburg, and First Call know and intend that these acts of racketeering will be committed through their participation in the enterprise, and MCAG, Baker, Haack, Ratzburg, and First Call have engaged in racketeering activities continuously over a period of nearly two years.

### 3.  MCAG RICO Enterprise

150.   Additionally and in the alternative, MCAG is a distinct association-in-fact and therefore forms an enterprise within the meaning of 18 U.S.C. § 1961(4). The members and leadership of MCAG operate as a single entity in managing the bond collection and "fugitive recovery" process. According to its website, MCAG has a highly organized structure including chains of command and individual ranks, modeled on a military structure. *See* https://sites.google.com/a/mt-

cag.org/mtcag/website-builder. This enterprise has an ongoing relationship and shares the common purposes of apprehending bail bonds clients, recovering bond deposits made with a court within the greater Missoula area, and engaging in kidnapping, extortion, and the extortionate collection of credit to achieve these ends.

151.  MCAG was founded on August 31, 2015. MCAG previously operated under the name Montana Minutemen.

152.  MCAG and its members search for, seize, and detain bail contract principals to coerce payment of bail bonding fees or to prevent the forfeiture of a bail bond deposit. Bail bond agents then pay MCAG 10% of the total value of the bail bond.

153.  MCAG and its members have engaged in bounty hunting dozens, if not hundreds, of times over the course of a two-year period.

154.  MCAG members regularly communicate about the status of individual clients, including through official email addresses.

155.  MCAG members work in close concert with one another to perform their bounty hunting activities and keep detailed notes in "field reports."

156.  MCAG and its members facilitate and participate in a pattern of racketeering through predicate acts of kidnapping, extortion, and extortionate collection of extension of credit. The members of the MCAG enterprise know and intend that these acts of racketeering will be committed through their participation

in the enterprise, and MCAG has engaged in racketeering activities continuously over a period of nearly two years.

157.   Each of the above-described RICO enterprises is engaged in interstate commerce in that its activities and transactions relating to the extension of credit, apprehension of bail bonds clients, and collection of bail bond deposits frequently require movement and communications across state lines and use of interstate facilities, including communication via email and phone. Further, Allegheny and International Fidelity have a nationwide presence. And MCAG has a presence (and has recruited "Fugitive Recovery Agents") in five different states.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**RICO Claim based on Extortionate Extension of Credit and Financing Extortionate Credit Transactions**
**18 U.S.C. § 1962(c)**
***Plaintiffs Mitchell and Meuchell versus All Defendants***

158.   Plaintiffs re-allege and incorporate by reference each and every allegation above as if fully set forth herein.

159.   All Defendants have conducted or participated in and conspired to conduct the affairs of a RICO enterprise by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1), in violation of 18 U.S.C. § 1962(c):

a. Making extortionate extensions of credit, as defined in 18 U.S.C. § 892; and

b. Financing extortionate credit transactions, as defined in 18 U.S.C. § 893.

1. Making Extortionate Extensions of Credit

160.   Though their enterprise, Defendants made extortionate extensions of credit by entering into bail bonds agreements with accused people, like Mr. Mitchell, and engaging in bounty hunting as a means of enforcing those bail bonds agreements.

161.   Through bail bonds agreements, Ratzburg, First Call, Allegheny, and International Fidelity (Bond Company Defendants) extended credit to their clients, including Mr. Mitchell, in two ways: first, by accepting deferred payment on all or part of a bail bond premium or deposit, such that a bail bonds client owed an additional payment on the premium under threat of possible violence; and second, by agreeing to pay the entire outstanding amount of a bail bond in order to secure release, while retaining the ability to recover such payment from their clients.

162.   The Bond Company Defendants explicitly indicate that they use bounty hunting to recover payments from their clients, like Mr. Mitchell, and MCAG, Baker, and Haack have continuously engaged in such bounty hunting on behalf of the Bond Company Defendants. It was thus understood by persons contracting with

the Bond Company Defendants than any delay or failure to make outstanding any payment could result in acts of violence including but not limited to forceful entry of a home, apprehension with firearms, and kidnapping. It was also understood by persons contracting with the Bond Company Defendants that any effort by the Bond Company Defendants to recover the full amount of the bail bond could result in similar acts of violence.

163.   Defendants have continuously used their enterprise to make similarly extortionate extensions of credit to other persons.

164.   The proceeds of the Bond Company Defendants' extortionate activities were used in interstate commerce. Mr. Mitchell and Ms. Meuchell were precluded from using money paid to the Bond Company Defendants to purchase other goods in interstate commerce. The Defendants' actions therefore affected commerce or the movement of any article or commodity in commerce, as these terms are understood by 18 U.S.C. § 1951(a).

2.   Financing Extortionate Credit Transactions

165.   Though their enterprise, Defendants financed extortionate credit transactions by entering into bail bonds agreements with Mr. Mitchell and other similarly situated people and engaging in bounty hunting as a means of enforcing those bail bonds agreements.

166. Through producer agreements, the Bond Company Defendants willfully advanced money or property to underwrite and act as surety on secured bail bonds for persons, including Mr. Mitchell. Because the Bond Company Defendants explicitly contemplated the use of bounty hunting—including through MCAG, Baker, and Haack—in order to collect any unpaid premiums, demand payment due to forfeiture, or to enforce other provisions of the bond agreement, this extension of credit created both an explicit and implied threat of violence as discussed above in paragraph 162.

167. The Bond Company Defendants had both actual knowledge of and reasonable grounds to believe that the money or property advanced to back bail bonds agreements was being used directly or indirectly for the purpose of making extortionate extensions of credit.

168. Defendants continuously used their enterprise to finance extortionate credit transactions to other persons.

169. As a direct and proximate result of Defendants' willful, knowing, and intention acts discussed in this Claim, Mr. Mitchell and Ms. Meuchell have suffered injuries to their property or business—including money obtained unlawfully by Defendants, physical damage to property, and increased utilities expenses because of that property damage—through kidnapping, assault, and extortion.

## SECOND CLAIM FOR RELIEF
### RICO Claim based on Kidnapping, Extortion, Extortionate Extension of Credit, Extortionate Collection of Extension of Credit, and Financing Extortionate Credit Transactions
### 18 U.S.C. § 1962(c)
### *Plaintiffs Mitchell and Meuchell versus Defendants MCAG, Baker, Haack, First Call, and Ratzburg*

170.  Plaintiffs re-allege and incorporate by reference each and every allegation above as if fully set forth herein.

171.  Defendants MCAG, Baker, Haack, First Call, and Ratzburg have conducted or participated in and conspired to conduct the affairs of a RICO enterprise by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1), in violation of 18 U.S.C. § 1962(c):

a.  Simple kidnapping in violation of Mont. Code Ann. § 45-5-302;

b.  Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951;

c.  Making extortionate extensions of credit, as defined in 18 U.S.C. § 892;

d.  Collection of extension of credit through extortionate means, as defined in 18 U.S.C. § 894; and

e.  Financing extortionate credit transactions, as defined in 18 U.S.C. § 893.

1.  Simple Kidnapping

172.   Though their enterprise, MCAG, Baker, Haack, First Call, and Ratzburg committed the crime of kidnapping by intentionally and forcibly seizing Mr. Mitchell without his consent, carrying him from his home to the Ravalli County Detention Center, and keeping him there against his will. MCAG, Baker, Haack, First Call, and Ratzburg have continuously used their enterprise to similarly kidnap other persons.

173.   MCAG, Baker, Haack, First Call, and Ratzburg did this with the intent to obtain money from Mr. Mitchell's surrender under his bond agreement with the Bond Company Defendants (Ratzburg, First Call, Allegheny, and International Fidelity). Though untrue, the Bounty Hunters believed that Mr. Mitchell owed the Bond Company Defendants an outstanding $115 payment on his contract premium.

2.  Extortion

174.   MCAG, Baker, Haack, First Call, and Ratzburg, through their enterprise, obtained payment of bail bonding fees from Mr. Mitchell and Ms. Meuchell by threatening to seize and detain Mr. Mitchell if they failed to make the demanded payment, and by violently seizing and surrendering Mr. Mitchell to the Ravalli County Detention Center.

175.   MCAG, Baker, Haack, First Call, and Ratzburg obtained payments from Mr. Mitchell and Ms. Meuchell, and other persons, through the wrongful use

of actual and threatened force and fear, in violation of 18 U.S.C. § 1951 (Hobbs Act). MCAG, Baker, Haack, First Call, and Ratzburg have continuously used their enterprise to extort other persons.

176.   The proceeds of the extortionate activities of MCAG, Baker, Haack, First Call, and Ratzburg were used in interstate commerce. Mr. Mitchell and Ms. Meuchell were precluded from using money paid to these Defendants to purchase other goods in interstate commerce. The conduct of MCAG, Baker, Haack, First Call, and Ratzburg therefore affected commerce or the movement of any article or commodity in commerce, as these terms are understood by 18 U.S.C. § 1951(a).

### 3.   Extortionate Extension of Credit

177.   Though their enterprise, MCAG, Baker, Haack, First Call, and Ratzburg made extortionate extensions of credit by entering into bail bonds agreements with Mr. Mitchell and other similarly situated people, and engaging in bounty hunting as a means of enforcing those bail bonds agreements.

178.   Through bail bonds agreements, Ratzburg and First Call extended credit to their clients, including Mr. Mitchell, in two ways: first, by accepting deferred payment on all or part of a bail bond premium or deposit, such that a bail bonds client owed additional payment on the premium under threat of possible violence; and second, by agreeing to pay the entire outstanding amount of a bail

bond in order to secure release, though withholding the ability to recover such payment from their clients in the event of forfeiture.

179.   Ratzburg and First Call acknowledge that they used bounty hunting to recover payments from Mr. Mitchell and others. MCAG, Baker, and Haack continuously engaged in such bounty hunting on behalf of Ratzburg and First Call. It was thus understood by persons contracting with Ratzburg and First Call than any delay or failure to make outstanding payment could result in acts of violence including but not limited to forceful entry of a home, apprehension through firearms, or kidnapping. It was also understood by persons contracting with Ratzburg and First Call that any effort by Ratzburg and First Call to recover the full amount of the bail bond could result in similar acts of violence.

180.   MCAG, Baker, Haack, First Call, and Ratzburg continuously used their enterprise to make similarly extortionate extensions of credit to other persons.

### 4. Extortionate Collection of Extension of Credit

181.   MCAG, Baker, Haack, First Call, and Ratzburg, through their enterprise, engaged in the extortionate collection of extension of credit by using actual and threatened wrongful arrest, detention, and kidnapping to ensure payment on bail bond deposits and as collateral for the full bail bond amounts paid or underwritten.

5.  Financing Extortionate Credit Transactions

182.  Though their enterprise, MCAG, Baker, Haack, First Call, and Ratzburg financed extortionate credit transactions by entering into bail bonds agreements with Mr. Mitchell and other similarly situated people, and engaging in bounty hunting as a means of enforcing those bail bonds agreements.

183.  Through bail bond agreements, First Call and Ratzburg willfully advanced money or property to post secured bail bonds and act as surety for persons including Mr. Mitchell. Because Ratzburg and First Call explicitly contemplated the use of bounty hunting in order to collect any unpaid premiums, demand payment due to forfeiture, or to enforce other provisions of the bond agreement, this extension of credit created both an explicit and implied threat of violence as discussed above in paragraph 162.

184.  Thus, Ratzburg and First Call had both actual knowledge of and reasonable grounds to believe that the money or property advanced to back bail bonds agreements was being used directly or indirectly for the purpose of making extortionate extensions of credit.

185.  MCAG, Baker, Haack, First Call, and Ratzburg continuously used their enterprise to finance extortionate credit transactions to other persons.

186.  As a direct and proximate result of the willful, knowing, and intentional acts of MCAG, Baker, Haack, First Call, and Ratzburg discussed in this claim for

relief, Mr. Mitchell and Ms. Meuchell have suffered injuries to their property or business—including money obtained unlawfully by MCAG, Baker, Haack, First Call, and Ratzburg, physical damage to property, and increased utilities expenses because of that property damages—through kidnapping, assault, and extortion.

## THIRD CLAIM FOR RELIEF
**RICO Claim based on Kidnapping, Extortion, and Extortionate Collection of Extension of Credit,
18 U.S.C. § 1962(c)**
*Plaintiffs Mitchell and Meuchell versus Defendants MCAG, Baker, and Haack*

187. Plaintiffs re-allege and incorporate by reference each and every allegation above as if fully set forth herein.

188. Defendants MCAG, Baker, and Haack ("MCAG Enterprise Defendants") have conducted or participated in and conspired to conduct the affairs of a RICO enterprise by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1), in violation of 18 U.S.C. § 1962(c):

    a.  Simple kidnapping in violation of Mont. Code Ann. § 45-5-302;

    b.  Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951;

    c.  Collection of extension of credit through extortionate means, as defined in 18 U.S.C. § 894.

1.  Kidnapping

189.   Though their enterprise, the MCAG Enterprise Defendants committed the crime of kidnapping by intentionally and forcibly seizing Mr. Mitchell without his consent, carrying him from his home to the Ravalli County Detention Center, and keeping him there against his will. The MCAG Enterprise Defendants have continuously used their enterprise to similarly kidnap other persons.

2.  Extortion

190.   The MCAG Enterprise Defendants, through their enterprise, obtained payment of bail bonding fees from Mr. Mitchell and Ms. Meuchell by seizing and surrendering Mr. Mitchell to the Ravalli County Detention Center. And because of the continuous bounty hunting activities of the MCAG Enterprise Defendants, Mr. Mitchell and Ms. Meuchell reasonably believed that they faced violence, kidnapping, or unlawful restraint when Ratzburg threatened Mr. Mitchell in order to demand the full payment of his bail bond deposit.

191.   Though untrue, the MCAG Enterprise Defendants believed that Mr. Mitchell owed the Bond Company Defendants an outstanding $115 payment on his contract premium.

192.   The MCAG Enterprise Defendants aided in the collection of bond payments through the wrongful use of actual and threatened force and fear, in

violation of 18 U.S.C. § 1951 (Hobbs Act). The MCAG Enterprise Defendants have continuously used their enterprise to extort other persons.

193.   The proceeds of MCAG Enterprise Defendants' extortionate activities were used in interstate commerce.

### 3.   Collection of Credit Through Extortionate Means

194.   The MCAG Enterprise Defendants, through their enterprise, engaged in the extortionate collection of debts by using actual and threatened wrongful arrest, detention, and kidnapping in order to both ensure full payment of bail premiums and to prevent forfeitures of bonds posted by bail bondsmen and insurance companies.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Montana Consumer Protection Act**
**Mont. Code Ann. § 30-14-103**
***Plaintiffs Mitchell and Meuchell versus Defendants First Call, Ratzburg,***
***Allegheny, and International Fidelity***

195.   Plaintiffs re-allege and incorporate by reference each and every allegation above as if fully set forth herein.

196.   Mr. Mitchell and Ms. Meuchell are "consumers" within the meaning of Mont. Code Ann. § 30-14-102(1), because in entering Mitchell's bond agreement they are each "a person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes."

197.   First Call, Ratzburg, Allegheny, and International Fidelity are engaged in "trade" and "commerce" within the meaning of Mont. Code Ann. § 30–14–102(8), as in contracting with individuals for for-profit bail bond services they are engaged in "the advertising, offering for sale, sale, or distribution of any services, any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value, wherever located . . . directly or indirectly affecting the people of this state."

198.   First Call, Ratzburg, Allegheny, and International Fidelity's actions in imposing unconscionable contract terms on Mr. Mitchell while he was incarcerated and unable to review the terms, in subjecting Mr. Mitchell and his family to violent intrusion and assaultive arrest, and in reserving for themselves unilateral power to increase Mr. Mitchell's bond, subject him to location monitoring, or unlawfully restrain him, amount to unfair methods of competition or unfair or deceptive acts or practices in the conduct of trade or commerce within the meaning of Mont. Code Ann. § 30-14-103.

199.   First Call and Ratzburg's use of threats of violence or unlawful restraint to obtain payment of bond premiums is an unfair or deceptive act or practice. Allegheny and International Fidelity are responsible for the actions of their authorized agents First Call and Ratzburg.

58

200.   As a result of First Call, Ratzburg, Allegheny, and International Fidelity's unfair or deceptive practices, Plaintiffs suffered a "loss of money or property, real or personal" within the meaning of Mont. Code Ann. § 30-14-133.

## FIFTH CLAIM FOR RELIEF
### Trespass
### *Plaintiffs versus all Defendants*

201.   Plaintiffs re-allege and incorporate by reference each and every allegation above as if fully set forth herein.

202.   Each Defendant or its agent participated in or authorized an intentional entry into Plaintiffs' home without consent or legal right. Mr. Mitchell, Ms. Meuchell, and B.M. did not validly consent to the forcible entry into their home through any discussions with MCAG and its members or by signing the agreement for Mr. Mitchell's release on bond.

203.   Defendants caused substantial injury to Plaintiffs' property by breaking their door, among other things.

## SIXTH CLAIM FOR RELIEF
### False Imprisonment
### *Plaintiffs versus all Defendants*

204.   Plaintiffs re-allege and incorporate by reference each and every allegation above as if fully set forth herein.

205.   In committing or authorizing the forcible entry of Plaintiffs' home and instructing Mr. Mitchell, Ms. Meuchell, and B.M. not to move while pointing guns at them, Defendants restrained all Plaintiffs unlawfully and against their will.

206.   In committing or authorizing the forcible entry of Plaintiffs' home and the violent seizure and apprehension of Mr. Mitchell, Defendants restrained Mr. Mitchell unlawfully and against his will. Defendants committed or authorized the apprehension of Mr. Mitchell and his involuntary relocation to the Ravalli County Detention Center, where he waited for an hour or more in the custody of MCAG and others.

207.   Mr. Mitchell was threatened by the MCAG members' forcible entry and display of weapons, such that he reasonably believed he could not disregard their orders and was thus deprived of his liberty.

## SEVENTH CLAIM FOR RELIEF
### Assault
### *Plaintiffs versus all Defendants*

208.   Plaintiffs re-allege and incorporate by reference each and every allegation above as if fully set forth herein.

209.   In committing or authorizing the forcible entry of Plaintiffs' home and the violent seizure and apprehension of Mr. Mitchell, Defendants intentionally threatened to make harmful or offensive contact with Plaintiffs. Armed with visible weapons, MCAG and its members, as agents for remaining Defendants, had an

apparent ability to carry out the threat of harmful or offensive contact. This created a well-founded fear on the part of Plaintiffs.

## EIGHTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
### *Plaintiffs versus all Defendants*

210.   Plaintiffs re-allege and incorporate by reference each and every allegation above as if fully set forth herein.

211.   MCAG members acted intentionally when they forcibly broke into Plaintiffs' home with weapons visible or drawn, and each Plaintiff's serious or severe emotional distress was a reasonably foreseeable consequence. MCAG members acted as the authorized agents of each additional Defendant when they broke into Plaintiffs' home.

212.   Each Plaintiff has suffered serious or severe emotional distress as a result of Defendants' intentional conduct.

## NINTH CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress
### *Plaintiffs versus all Defendants*

213.   Plaintiffs re-allege and incorporate by reference each and every allegation above as if fully set forth herein.

214.   MCAG members acted negligently or recklessly when they forcibly broke into Plaintiffs' home with weapons visible or drawn, and each Plaintiff's serious or severe emotional distress was a reasonably foreseeable consequence.

MCAG members acted as the authorized agent of each additional Defendant when they broke into Plaintiffs' home.

215.   Plaintiffs have suffered serious or severe emotional distress as a result of Defendants' negligent or reckless conduct.

## TENTH CLAIM FOR RELIEF
### Strict Liability
### *Plaintiffs versus All Defendants*

216.   Plaintiffs re-allege and incorporate by reference each and every allegation above as if fully set forth herein.

217.   Bounty hunting is an abnormally dangerous activity.

218.   The degree and likelihood of harm likely presented by bounty hunting is great, as injury, property damage, or even death are potential outcomes of bounty hunting.

219.   Moreover, bounty hunting is not a common profession or activity.

220.   Given the availability of alternative means to promote the government's interests in court appearance at bail setting,[69] the dangers of bounty hunting weigh strongly against the public interest.

---

[69] *See, e.g.*, Brice Cooke et al., *Using Behavioral Science to Improve Criminal Justice Outcomes Preventing Failures to Appear in Court*, Ideas41 and The University of Chicago Crime Lab, 4 (2018) (Finding that redesigning summons forms to plain, understandable language reduced FTA rate by 13% and text message reminders of court dates reduced FTA rates by as much as 26%); Pretrial Justice Center for Courts, *Use of Court Date Reminder Notices to Improve Court*

221.   All Defendants are therefore liable for the abnormally dangerous activity of MCAG, Baker, and Haack, who acted within the scope of their authority as agents of Ratzburg and First Call, and subagents of Allegheny and International Fidelity. *See Matkovic v. Shell Oil,* 707 P.2d 2, 3–4 (Mt. 1985); Second Restatement of Torts § 519.

## ELEVENTH CLAIM FOR RELIEF
### Negligence
### *Plaintiffs versus All Defendants*

222.   Plaintiffs re-allege and incorporate by reference each and every allegation above as if fully set forth herein.

223.   Bounty hunting is an inherently dangerous activity.

224.   Bounty hunting, if done unskillfully or carelessly, involves a grave risk of serious bodily harm or death. *Nelson v. United States*, 2006 WL 8435786, at *5 (D. Mont. March 8, 2006) (citing Restatement (First) of Torts § 427A (1934)).

---

*Appearance Rates*, Pretrial Justice Brief 10, 3 (September 2017) (Coconino County, AZ used court date reminder calls and the FTA reduced from 25.4% to 5.9% for those who received them); *Schultz*, 330 F. Supp. 3d 1344, at 1363 ("The failure to appear rate of low-income defendants in Luzerne County, Pennsylvania decreased from 15% to under 6% after implementing text-message court date reminders."); Jones, *supra* note 62, at 11 ("Whether released defendants are higher or lower risk or in-between, unsecured bonds offer decision-makers the same likelihood of court appearance as do secured bonds"); United States Courts, *Supervision Costs Significantly Less than Incarceration in Federal System*, www.uscourts.gov, *available at* http://www.uscourts.gov/news/2013/07/18/supervision-costs-significantly-less-incarceration-federal-system (last visited July 18, 2013) (discussing lower cost of pretrial supervision as compared to pretrial incarceration).

Bounty hunters typically carry weapons, frequently show up unannounced, and often forcibly enter homes or other buildings.

225.   Any party engaged in bounty hunting or hiring bounty hunters has a duty to ensure that it is done responsibly, skillfully, and with care. When they engaged in and directed the attack on Mr. Mitchell and Ms. Meuchell's home in a needlessly violent, reckless, and careless manner, MCAG, Baker, and Haack breached that duty.

226.   All Defendants are vicariously liable for the inherently dangerous activity of MCAG, Baker, and Haack, who acted within the scope of their authority as agents of Ratzburg and First Call, and subagents of Allegheny and International Fidelity.

## TWELFTH CLAIM FOR RELIEF
### Declaratory Judgment Act
### 28 U.S.C. § 2201 *et seq*.
### *Plaintiff Mitchell versus Defendants First Call, Ratzburg, Allegheny, and International Fidelity*

227.   Plaintiffs re-allege and incorporate by reference each and every allegation above as if fully set forth herein.

228.   Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2751 (4th ed. Nov. 2018 Update).

229.   There is an actual controversy between Plaintiff Mitchell, on the one hand, and Defendants First Call, Ratzburg, Allegheny, and International Fidelity, on the other, concerning the Bail Bond Agreement.

230.   Paragraph 5 of the Bail Bond Agreement provides in part as follows: Mitchell "agrees to defend, indemnify, and hold harmless the Surety and/or Bail Producer (including all agents, representatives and employees thereof) for any injuries, harm, losses, claims, lawsuits, damages, losses, liability, demands, actions, fees and expenses (including attorneys fees and costs) arising out of such activities."

231.   Under 28 U.S.C. § 2201, the Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

232.   Mr. Mitchell seeks a declaration that the indemnification and hold-harmless provisions in the Bail Bond Agreement are unenforceable because, among other things, the provisions are unconscionable and contrary to public   policy.

## THIRTEENTH CLAIM FOR RELIEF
### Declaratory Judgment Act
### 28 U.S.C. § 2201 *et seq*.
### *Plaintiffs Mitchell and Meuchell versus Defendants First Call, Ratzburg, Allegheny, and International Fidelity*

233.   Plaintiffs re-allege and incorporate by reference each and every allegation above as if fully set forth herein.

234.    Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2751 (4th ed. Nov. 2018 Update).

235.    There is an actual controversy between Plaintiffs Mitchell and Meuchell, on the one hand, and Defendants First Call, Ratzburg, Allegheny, and International Fidelity, on the other, concerning the Bail Bond Agreement.

236.    Provisions in paragraph 5 of the Bail Bond Agreement, provide as follows: Mitchell "understands, acknowledges, assumes and accepts that [his] failure to appear and resulting apprehension to custody is an activity that poses a peculiar risk of harm both to the Defendant and to others"; Mitchell "acknowledges and agrees that if [he] becomes subject to such apprehension and surrender, [he] is voluntarily participating in the activity of apprehension and recovery such that the risk of harm of such activity is not peculiar to [him]"; Mitchell "acknowledges and understands the peculiar risk of such activity and [he] is no longer a member of the general public who cannot anticipate such risk"; and Mitchell "knowingly accepts and assumes the subsequent risk of harm to [him] and others arising out of such apprehension and surrender activities."

237.    Provisions found in paragraph 15 of the Bail Bond Agreement provide as follows: Mitchell and Meuchell "irrevocably grant to Surety and Bail Producer,

and their agents and representatives, the right to enter your residence, or any other property that you own or occupy, without notice, at any time, for the purpose of locating, arresting, and returning [Mitchell] to custody, and subject to applicable law, you waive and release any and all causes of action in connection therewith including, without limitation, torts of trespass and false imprisonment."

238.   Under 28 U.S.C. § 2201, the Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

239.   Mr. Mitchell and Ms. Meuchell seek a declaration that the consent provisions in the Bail Bond Agreement are unenforceable because, among other things, the provisions are unconscionable and contrary to public policy.

## FOURTEENTH CLAIM FOR RELIEF
### Punitive Damages
### *Plaintiffs versus all Defendants*

240.   Plaintiffs re-allege and incorporate by reference each and every allegation above as if fully set forth herein.

241.   Defendants acted with knowledge of facts or intentionally disregarded facts that created a high probability of injury to Plaintiffs and, nevertheless, deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to Plaintiffs, or deliberately proceeded to act with indifference to the high probability of injury to the Plaintiffs.

242.   MCAG, Baker, and Haack acted recklessly and with deliberate indifference to the high probability that their actions would cause injury to Mr. Mitchell, Ms. Meuchell, and B.M.

243.   On information and belief, Ratzburg and First Call had knowledge of, or intentionally disregarded, facts that MCAG, Baker, and Haack conducted their bounty hunting activities in a manner creating a high likelihood of probability of injury to Plaintiffs. In dealings with MCAG, Baker, and Haack arising out of bail bonds agreements, Ratzburg and First Call operated as agents of Allegheny and International Fidelity.

244.   As a result of the actions of Defendants alleged in this complaint, punitive damages should be assessed against Defendants as a means to deter it and others, from engaging in the kind of activities alleged herein, in an amount to be determined at trial.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court provide the following relief:

a.     Assume jurisdiction over this action;

b.      Enter declaratory relief finding, *inter alia*, that the consent and hold harmless provisions in Mr. Mitchell's bail bond agreement are unconscionable and void as a matter of public policy;

c.      Award compensatory damages to all Plaintiffs;

d.      Award punitive damages to all Plaintiffs;

e.      Award damages to Plaintiffs under the Montana Consumer Protection Act, Mont. Code Ann. § 40-14-133(1), in the amount of $500 or their actual losses in money or property, whichever is greater, and treble damages in its discretion;

f.      Award treble damages to Mr. Mitchell and Ms. Meuchell as authorized by RICO, 18 U.S.C. § 1964(c);

g.      Award restitution of all funds illegally taken from Mr. Mitchell and Ms. Meuchell;

h.      Award Plaintiffs costs and reasonable attorney fees; and

i.      Order such other relief as the Court deems just and appropriate.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a jury for all issues so triable.

Dated: April 17, 2019.                    Respectfully submitted,

/s/ Alex Rate
Alex Rate
*On behalf of Attorneys for Plaintiff*

/s/ Toby J. Marshall

69

Toby J. Marshall (lead counsel)**
Beth Terrell**
Blythe H. Chandler**
Terrell Marshall Law Group, PLLC
936 N. 34th Street
Suite 300
Seattle, WA 98103
(206) 816-6603
tmarshall@terrellmarshall.com
bterrell@terrellmarshall.com
bchandler@terrellmarshall.com

/s/ Andrea Rose Woods
Andrea Rose Woods (lead counsel)**
American Civil Liberties Union Foundation
Criminal Law Reform Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2528
awoods@aclu.org

/s/ Alex Rate
Alex Rate
Elizabeth K. Ehret
American Civil Liberties Union of
Montana
P.O. Box 9138
Missoula, MT 59807
(406) 224-1447
ratea@aclumontana.org
ehrete@aclumontana.org

** *Admission pro hac vice pending*
***Attorneys for Plaintiffs***