IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

FILED

OCT 09 2019

Clerk, U.S Courts
District Of Montana
Missoula Division

EUGEN DESHANE MITCHELL,
SHAYLEEN MEUCHELL, *on their*
*own behalf and as next friend of* B.M.,

Plaintiffs,

vs.

FIRST CALL BAIL AND SURETY,
INC., ALLEGHENY CASUALTY
COMPANY, INTERNATIONAL
FIDELITY INSURANCE
COMPANY, THE MONTANA CIVIL
ASSISTANCE GROUP, MICHAEL
RATZBURG, VAN NESS BAKER,
and JASON HAACK,

Defendants.

CV 19–67–M–DLC

ORDER

Before the Court is Defendants First Call Bail and Surety, Inc. ("First Call"),

Allegheny Casualty Company ("Allegheny"), International Fidelity Insurance

Company ("Fidelity"), and Michael Ratzburg's (collectively "Surety Defendants")

Motion to Dismiss Plaintiffs' Complaint (Doc. 20), and Defendants' Motion to

Strike Plaintiffs' second Motion for Partial Summary Judgment (Doc. 47). For the

reasons explained, Defendants' Motion to Dismiss is granted in part and denied in

-1-

part and its Motion to Strike is denied. All of the claims at issue in the Motion to Dismiss will go forward, except Plaintiffs' strict liability claim which will be dismissed.

## BACKGROUND

Today, the majority of defendants charged with a felony use a commercial surety to post bail. (Doc. 1 at 21.) The commercial bail bond functions as a contract between the state, the defendant who promises to appear at a future court date, and the bond agent who acts as a surety of that promise. 8 C.J.S. Bail § 160. If the defendant does not appear, a court will forfeit the bond, giving the bond company the right to redeem its value against the defendant. Although, most courts permit a grace period by which the bond company can produce the defendant in order to avoid forfeiture. *E.g.*, Mont. Code Ann. § 46–9–503.

As between the defendant and the local bond company, the defendant pays a nonrefundable premium, typically ten percent of the bond, in exchange for the bond agent's services. (*Id.* at 37.) Behind the scenes, large insurance companies underwrite these bonds. (*Id.* at 27.) The bond premium paid by the defendant is shared between the bond agent and the insurance company. (*Id.* at 29.) In exchange for support and services the insurance company offers the local bondsman, the insurance company typically requires the bond agent to pay into a

"build-up fund" to cover the cost of forfeiture. (*Id.* at 32, 34.) For the insurance company, the bail bond is a low risk investment. (*See id.* at 30.) But the bondsman plays a high-risk game. At most, he stands to gain his portion of the premium. In the event of forfeiture, he stands to lose ten times as much. (*Id.* at 37.) To minimize this risk, the bondsman works with a bond recovery agent, colloquially known as a bounty hunter. The bounty hunter makes its money by retaining approximately ten percent of the total bond if he successfully captures the defendant. (*Id.* at 38.)

In early January 2017, Eugene Mitchell was arrested for driving with a suspended license and without proof of insurance. The court set bail at $1,670. Unable to pay, Mitchell's wife (Sheyleen Meuchell) entered into a private bail bond agreement with First Call (a local bond agency) to secure Mitchell's release. Allegheny and Fidelity were sureties on the bond. In exchange, Meuchell paid a $228 nonrefundable premium which Ratzburg (the owner of First Call) agreed to take in two installments. Meuchell paid $115 at the time of signing and paid the second installment approximately one week later. (*Id.* at 2–3.)

In the agreement signed by Meuchell and Mitchell (the "Agreement"), First Call reserved certain rights including the right to change the terms of the agreement and to use physical force to apprehend and arrest Mitchell in the event

-3-

he did not appear in court. (Doc 1-1.) Meuchell was hurried as she signed the contract and Mitchell had no opportunity to review its terms. (Doc. 1 at 4.)

On April 19, 2017 Mitchell failed to appear for court. (*Id.*) Two days later, Ratzburg hired Van Ness Baker, Jr., who is the Vice President of an organization called the Montana Civil Assistance Group ("MCAG") to arrest Mitchell. (*Id.* at 10–11.) Ratzburg issued a document entitled "Arrest of Defendant on Bail Bond" which "authoriz[ed] and empower[ed] Van Ness Baker it's [sic] representative and its stead, to arrest and detain" Mitchell. (*Id.* at 11.) Ratzburg also incorrectly informed MCAG that Mitchell still owed the second premium payment. (*Id.*) Montana law allows commercial bond sureties to arrest and surrender those who have failed to appear in court. Mont. Code Ann. § 46–9–510. Montana otherwise does not impose a license requirement or regulate the practice of bounty hunting. (*Id.* at 26.)

MCAG is a paramilitary group. It recommends its members carry semiautomatic rifles to be the "last line of defense against any threat" to our nation. MCAG performs for-hire bounty hunting services, typically retaining about ten percent of the total bail bond amount.[1] (*Id.* at 12.)

---

[1] In an online recruitment publication, MCAG explains that it is "employed by bail bondsmen; we are usually paid 10% of the total bail amount, but this commission can vary on an individual case-by-case basis; usually depending upon the difficulty level of the assignment and the approach used to exonerate the bail." (Doc. 1 at 12.)

–4–

Upon hire, members of MCAG were deployed to search for Mitchell. (*Id.* at 13.) They staked out his home over the weekend and surveilled his neighborhood. (*Id.*) Meuchell was aware she was being watched but did not know why. (*Id.* at 13–14.) At one point, when a guest arrived at the couple's house, MCAG members surrounded the visitor's car with their guns drawn for approximately twenty minutes while they questioned the driver and her teenage daughter. (*Id.* at 14.)

At approximately 9:20 p.m. on April 23, 2017, members of MCAG forcefully kicked in the door and entered the couple's home with their weapons drawn. (*Id.*) They entered the bedroom where Mitchell and Meuchell were lying in bed with their four-year old daughter. (*Id.* at 14–15.) With guns pointed at the family, someone gave the order not to move. (*Id.* at 5.) Mitchell was escorted from the room where he was handcuffed, arrested, and taken to the Ravalli County Detention Center, approximately an hour away. (*Id.*) MCAG filled out a field report and someone called Ratzburg during the arrest to notify him that the "team was securing Mitchell." (*Id.* at 15.)

When MCAG arrived at the jail, they produced Ratzburg's petition. (*Id.* at 16.) However, the officers initially refused to accept Mitchell because MCAG did not have an arrest warrant signed by a judge. (*Id.*) Officers then began to work up

an unlawful detainment charge against MCAG for their unlawful arrest of Mitchell.[2] (*Id.* at 17.) The five bounty hunters present for the break-in have since been charged with assault with a weapon, aggravated burglary, unlawful restraint, accountability for aggravated burglary, and criminal mischief as a result of the incident. (*Id.* at 2.)

## LEGAL STANDARD

Rule 12(b)(6) motions test the legal sufficiency of a pleading. Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8 "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the court can draw a "reasonable inference" from the facts that the defendant is liable for the misconduct alleged. *Id.* On a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in the complaint as true and construe the

---

[2] Mitchell was also arrested when the Hamilton Police Department realized that there was a Montana Highway Patrol Warrant out for Mitchell's arrest.

pleadings in the light most favorable to the nonmoving party. *Kneivel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

Legal conclusions, on the other hand, are not entitled to the same presumption of truth. Dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990); *Graehling v. Village of Lombard, Ill.*, 58 F.3d 295, 297 (7th Cir. 1995).

When ruling on a motion to dismiss, a court generally cannot consider material outside the complaint. *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). Nevertheless, a court may consider exhibits submitted along with the complaint where the exhibits are: (1) specifically referred to in the complaint; (2) central to the plaintiff's claim; and (3) no party questions the authenticity of the attached documents. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). This rule is designed to prevent plaintiffs from "deliberately omitting reference to documents upon which their claims are based." *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998).

Surety Defendants move to dismiss the following: Claims 1 and 2 alleging RICO violations; Claim 4 arising under the Montana Consumer Protection Act; Claims 5, 6, 7 and 10 alleging violations of state law for trespass, false imprisonment, assault, and strict liability. The Court will address the claims arising under state law first.

## I.    State law claims

### A. Trespass, False Imprisonment & Assault

Surety Defendants argue that the claims for trespass, false imprisonment, and assault fail because Montana law expressly allows sureties to recover, arrest, and surrender a defendant for whom a bail bond has been posted. (Doc. 21 at 33–34.) The first issue is whether Montana law recognizes either a common law or statutory right for a bail bondsman to arrest a defendant. The related question is whether the Agreement provided First Call with a privilege to detain Mitchell in this case.

### i.    Whether Montana law recognizes a bondsman's privilege

The importance of maintaining liberty while a person is accused and awaiting trial dates back to the Magna Carta and early forms of habeas corpus. *See* Caleb Foote, *The Coming Constitutional Crisis in Bail: I and II*, 113 Univ. Pa. L.

Rev. 959, 965–67 (1965). Traditionally, the American bail system permitted a surety to guarantee the future appearance of the defendant and payment of any penalty if convicted. Timothy R. Schnacke et. al., *The History of Bail and Pretrial Release*, Pretrial Justice Inst., 1–2 (Sept. 23, 2010). Historically, the surety was someone who shared a close relationship with the defendant, such as a friend, neighbor, or family member. *Id.* at 6. "Under the early common law, the bondsman not only undertook the risk of loss of his own property if his principal did not appear, but in some instances, the bondsman was made to suffer the punishment which would have been inflicted upon the prisoner." *Ouzts v. Maryland Nat. Ins. Co.*, 505 F.2d 547, 551 (9th Cir. 1974). As a result of this responsibility, the early common law recognized a bondsman's privilege to arrest and surrender the defendant without resort to the legal process. *Id.* In 1872, the United States Supreme Court recognized this privilege in dicta. *Taylor v. Taintor*, 83 U.S. (16 Wall.) 366, 371–72 (1872). In an oft quoted passage, the Court observed:

> When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; and, if necessary, may break and enter his house for that purpose. The seizure is not made by virtue

of new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner.

*Id.*

The bondsman's privilege is a private privilege that arises from the contractual relationship between the parties; it is not governed by criminal procedure. *Ouzts*, 505 F.2d at 551; *Fitpatrick v. Williams*, 46 F.2d 40, 40–41 (5th Cir. 1931).

The parties initially dispute whether Montana law recognizes any common law bondsman's privilege. Plaintiffs argue that the privilege recognized in *Taylor v. Taintor* does not apply because *Taylor* was decided in a pre-*Erie* era "in which courts conceived of the common law as a 'brooding omnipresence in the sky'." (Doc. 29 at 17 (quoting *Rodriguez-Tirado v. Speedy Bail Bonds*, 891 F.3d 38, 41 (1st Cir. 2018)).) Plaintiffs argue that this view has been "'dramatically discarded' [since] *Erie*, and it is now well understood that each state declares its own common law rules." (*Id.*) Be that as it may, it appears Montana has adopted a common law bondman's privilege. In 1892, Chief Justice Blake address the existence of such a privilege, writing:

> It is the theory of the law that the defendant in criminal proceedings is under the control of the court, and in actual or constructive custody. Biesman was in the custody of his sureties. In the last case Mr. Justice FIELD for the court said: "By the recognizance the principal is, in the theory of the law, committed to the custody of the sureties as to jailers of his own choosing, not that he is, in point of fact in this country, at least, subjected, or can be subjected, by them to constant

-10-

imprisonment; but he is so far placed in their power that they may at any time arrest him upon the recognizance, and surrender him to the court, and, to the extent necessary to accomplish this, may restrain him of his liberty[.]

*State v. Biesman*, 29 P. 534, 536 (1892) (internal citations omitted).

Plaintiffs next argue that, to the extent any privilege exists, it has been abrogated by statute, citing section 46–9–510(b).[3] Plaintiffs contend that the legislature's specific use of the phrase "surety company" authorizes the "surety company' itself—and not any other agent—to "arrest and surrender" the defendant under the specified circumstances. (*Id.* at 16.)

As Plaintiffs note, Montana's statute vests the authority for the arrest and surrender with the "surety company." Mont. Code Ann. § 46–9–510(b). As recognized above, the existence of a bondsman's privilege derives from the contractual relationship between the parties. As it is the "surety company,"—the entity—that entered into a bail bond agreement with the defendant, it is the surety company who holds the privilege. However, quite literally, an entity cannot arrest, nor can it surrender, anyone. Entities act through agents. *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348 (1985). There is nothing in the plain language of section 46–9–510(d) that limits a "surety company" to send only its employees to "arrest and surrender" a defendant rather than an independent

---

[3] Montana Code Annotated § 46–9–401(1)(d) provides "[T]he surety company may arrest the defendant and surrender the defendant to the court, any peace officer, or any detention center facility of this state" "at any time before the forfeiture of bail or within 90 days after forfeiture."

contractor, i.e. a bounty hunter. Furthermore, any common law privilege is only abrogated to the extent it is inconsistent with a statute. *See Sunburst School Dist. No. 2 v. Texaco, Inc.*, 165 P.3d 1079, 1091 (Mont. 2007). The absence of any limiting language in section 46–9–510(d) (for example, "only a surety company") is fatal to Plaintiffs' argument. If anything, section 46–9–510(d) is consistent with *State v. Biesman*. The Court construes it to recognize, not limit, a bondsman's privilege.

## ii. Whether Surety Defendants are immune from liability because of the privilege?

Recognizing the existence of a privilege is not the same thing as determining whether the conduct in a particular circumstance conformed with the privilege. Privileges are not unlimited. *E.g.*, Mont. Code Ann. § 45–6–201(1) (privilege to enter the residence of another "may be revoked at any time by personal communication of notice by the landowner or other authorized person . . . "); *United States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006) ("It is a violation of a suspect's Fourth Amendment rights for a consensual search to exceed the scope of the consent given.")

As indicated, the bondsman's privilege does not derive from criminal procedure. Nevertheless, the Court is not convinced that the privilege exceeds the legal authority of the state. The state's arrest power is limited by important

–12–

constitutional and policy principles. *See Cassady v. Yellowstone Cty. Mont. Sheriff Dep't*, 143 P.3d 148, 154, 159 (officers are limited to use "only such force as is objectively reasonable under the circumstances" and must "knock and announce their presence" in accord with "concerns for privacy, reduction in the potential for violence, and preventing the destruction of private citizens' property[.]") The arrest power of a private citizen is even narrower. *See State v. Updegraff*, 267 P.3d 28, 34 (Mont. 2011). Even *Biesman*, in describing the bondman's privilege, recognized certain limitations: the surety cannot keep the defendant in constant custody and may only use force as reasonably necessary to accomplish a surrender. 29 P. at 536. Furthermore, if the bondsman's privilege springs from the parties consent, the contract is upheld only where the consent is meaningful and freely given at the time the exchange was made. *See Gamble v. Sears*, 160 P.3d 537, 543 (Mont. 2007).

Surety Defendants seek to limit their liability by claiming that Mitchell agreed to allow First Call to enter his property and detain him. This raises two questions of fact: First, did Mitchell consent to the Agreement? Second, did MCAG's conduct conform with the privilege?

The Complaint alleges that neither Meuchell nor Mitchell was given adequate opportunity to review the contract's terms and had no bargaining power

to change them. (Doc. 1 at 9.) Moreover, the Complaint alleges that the Agreement vested the Surety Defendants with unilateral power to "change the terms of the agreement" at any time. (*Id.* at 4.) It is a basic principle of contract law that unless both parties to a contract are bound, neither is bound. *See Boise Cascade Corp. v. First Sec. Bank of Anaconda*, 600 P.2d 173, 181 (Mont. 1979). Therefore, the Complaint adequately alleges that the couple did not meaningfully consent to the terms of the Agreement.

The Complaint further alleges that MCAG entered Mitchell's home with no warning, no prior contact, and with their guns drawn. (*Id.* at 2, 15.) Two members of the team carried assault rifles. (*Id.*) MCAG did not knock or announce their presence but broke down the door and proceeded into the bedroom where they pointed their weapons not only at Mitchell and Meuchell, but also at B.M, the couple's four-year old daughter. (*Id.* at 14–15.) This raises a plausible inference that the conduct exceeded the scope of the privilege being not reasonably necessary to accomplish Mitchell's surrender. Plaintiffs' claims for trespass, false imprisonment, and assault will advance.

## B. Strict liability

The Complaint alleges a strict liability claim on the theory that bounty hunting is an inherently dangerous activity. Surety Defendants argue that this

claim should be dismissed because Allegheny, Fidelity, First Call, and Ratzburg are not bounty hunters themselves and because the Complaint fails to allege the key elements of a strict liability claim. (Doc. 21 at 35.)

As a preliminary matter, First Call and Ratzburg are not off the hook simply because they hired MCAG to bounty hunt on their behalf, though Allegheny and Fidelity may be. Certain duties are nondelegable. *See, e.g., Kemp v. Bechtel Constr. Co.*, 720 P.2d 270, 274–75 (Mont. 1986) (citing *Ulmen v. Schwieger*, 92 Mont. 331, 12 P.2d 856, 858 (1932)). If the activity of bounty hunting is abnormally dangerous, First Call and Ratzburg cannot avoid liability by relegating that service to others. *See id.*

Whether an activity is abnormally dangerous depends upon consideration of the following factors:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) likelihood that the harm that results from it will be great;
> (c) inability to eliminate the risk by the exercise of reasonable care;
> (d) extent to which the activity is not a matter of common usage;
> (e) inappropriateness of the activity to the place where it is carried on; and
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Matkovic v. Shell Oil Co.*, 707 P.2d 2, 4 (1985) (quoting *The Restatement (Second) of Torts* § 519 (1976)).

The first two factors are satisfied. Bounty hunting contains a high degree of risk of harm. As weapons are regularly used in the act, the risk contemplated is death or serious bodily harm, which presents a "likelihood" that when harm occurs the harm will be "great." However, the third factor—"inability to eliminate the risk by exercise of reasonable care"—is not satisfied. Plaintiffs argue that the third factor turns on whether risk can be "eliminated—not merely limited—by the exercise of care." (Doc. 29 at 35.) Certainly, bounty hunting is an activity that can be made safer when more care is exercised, for example through adequate training, selection of venue, and choice and use of weapon. But Plaintiffs contend that this is not enough, since the danger cannot be "eliminated." *See Restatement* § 520, cmt. h. However, comment h makes clear that the danger contemplated is not the danger of those intimately involved in the activity, but the general public:

> [m]ost ordinary activities can be made entirely safe by the taking of all reasonable precautions . . . . [T]here is probably no activity, unless it is perhaps the use of atomic energy, from which all risks of harm could not be eliminated by the taking of all conceivable precautions, and the exercise of the utmost care, particularly as to the place where it is carried on . . . . It is not necessary, for the factor stated in Clause (c) to apply, that the risk be one that no conceivable precautions or care could eliminate. What is referred to here is the unavoidable risk remaining in the activity, even though the actor has taken all reasonable precautions in advance and has exercised all reasonable care in his operation, so that he is not negligent. The utility of his conduct may be such that he is socially justified in proceeding with his activity, but the unavoidable risk of harm that is inherent in it requires that it be carried on at his peril, rather than at the expense of the innocent person who suffers harm as a result of it.

*Id.*

The question is whether there is a residual risk to the public even after the actors engaged in bounty hunting take all conceivable precautions such that they are not negligent. This is a theoretical inquiry. On the continuum of risk, bounty hunting becomes safer the more care is exercised, such that the risk to innocent bystanders is virtually eliminated when it is conducted outside the presence of third parties or with willing surrender by the defendant.

The fourth factor, the "inappropriateness of the activity to the place where it is carried on" is also unmet. It is no stretch of the imagination to think that many bounty hunters arrest defendants in their homes, as occurred here. Notwithstanding the particulars of this arrest, the home is not an inappropriate location to apprehend an individual in terms of limiting risk to the general public.

Finally, on the question of value to the community, the value of ensuring that those accused of a crime may be released prior to trial is of the utmost importance, as recognized by both parties. (Docs. 1 at 18–19; 21 at 14–15.) Today, the majority of people released on bail use a commercial surety. (Doc. 1 at 21.) Because bounty hunting goes part and parcel with the commercial bail bond industry it would seem to be an important activity to the community. Having

weighed each of these factors, the Court concludes that bounty hunting is not an abnormally dangerous activity to impose strict liability. This claim is dismissed.

## C. Montana Consumer Protection Act

Plaintiffs allege a violation of the Montana Consumer Protection Act ("MCPA"). Surety Defendants argue that this claim should be dismissed because it is time barred and bail bond services are not "unfair" as established by public policy. (Doc. 21 at 32.)

Turning to the statute of limitations issue, Surety Defendants argue that the claim expired on January 4, 2018 which is two years to date after Mitchell and Meuchell entered into the bond agreement with First Call. (*Id.* at 33.) Plaintiffs contend that the claim is timely because it was filed before the statutory period concluded on April 23, 2019 which is two years to date after MCAG agents broke into the couple's home. (Doc. 29 at 33.)

In Montana, the statutory period begins when "all elements of the claim or cause exist or have occurred." Mont. Code Ann. § 27–2–102. The MCPA makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Mont. Code Ann. § 30–14–103. To have standing under the MCPA, a plaintiff must have suffered an "ascertainable loss of money or property" as a result of the "unfair methods" or

"unfair or deceptive acts or practices." *Hill v. LLR, Inc.*, No. CV–18–120–GF–BMM–JCL, 2019 WL 2404900, at *3 (D. Mont. Mar. 8, 2019), *report and recommendation adopted as modified*, No. CV–18–120–GF–BMM, 2019 WL 3024896 (D. Mont. July 11, 2019).

Meuchell and Mitchell entered into the Agreement with First Call on January 4, 2016. The Agreement required that they pay a nonrefundable $228 bail premium. The Complaint does not allege that this rate was unfair or deceptive or resulted in a wrongful deprivation of property. Though the Complaint alleges that Mitchell and Meuchell were deprived of fair bargaining power and lacked sufficient time to read the Agreement, there was no injury that resulted from these concerns, at least initially. As of January 4, both parties performed as desired. First Call posted the bond and Mitchell was released.

The Complaint next describes that sometime later, Ratzburg contacted Mitchell to inform him that if he did not pay the remaining balance on his bond premium, Ratzburg would "get" him. But Ratzburg did not "get" him and thus no injury occurred. It wasn't until Mitchell failed to appear in court and Ratzburg sent MCAG to arrest Mitchell that he sustained an injury that would permit him to sue under the MCPA. Accordingly, Plaintiffs are correct that the statute of limitations

did not begin to run until April 21, 2017 making the April 17, 2019 Complaint timely.

Finally, Surety Defendants allege that the MCPA claim fails as a matter of law because it is based on lawful activities. (Doc. 21 at 33.) While commercial bail bond transactions are lawful in Montana, Plaintiffs have adequately pled the existence that this particular transaction was "unfair" as the cumulative result of the: (1) lack of opportunity to understand the terms of the Agreement; (2) lack of bargaining power; and (3) degree of force used in execution. This claim will advance.

## II. RICO Claims

Surety Defendants argue that Plaintiffs' RICO claims are preempted by the McCarran-Ferguson Act and fail to allege all elements of a RICO claim.

### A. Reverse Preemption

The McCarran-Ferguson Act provides that "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance[.]" 15 U.S.C. § 1012(2)(b). The McCarran-Ferguson Act is said to "reverse preempt" a federal statute if: "(1) the federal law does not specifically relate to insurance; (2) the purpose of the state enactment is to

-20-

regulate the business of insurance; and (3) the application of federal law to the case might invalidate, impair, or supersede the state law." *Ojo v. Farmers Group, Inc.*, 600 F.3d 1201, 1203 (9th Cir. 2010) (per curiam) (en banc) (citing *Humana Inc. v. Forsyth*, 525 U.S. 299, 307 (1999)). This is a fact intensive inquiry. *Negrete v. Allianz Life Ins. Co. of N. Am.*, 927 F. Supp. 2d 870, 878 (C.D. Cal. 2012) ("A broadly-drafted federal statute, such as RICO, may impair state insurance laws in some circumstances but not in others, depending on the 'theory of liability asserted and the relief sought by [the] plaintiffs.'" (citation omitted)). And where a "federal law is applied in aid or enhancement of state regulation, and does not frustrate any declared state policy or disturb the State's administrative regime, the McCarran–Ferguson Act does not bar the federal action." *Humana*, 525 U.S. at 303.

That RICO does not "specifically relate to the business of insurance" is not in dispute. Therefore, the first element is satisfied. The second element requires the Court to consider whether "the state law is enacted for the purpose of regulating insurance." Surety Defendants cite "Montana's comprehensive insurance code" as the state law at issue. Certainly, there can be no dispute that Montana's insurance code was enacted to regulate the business of insurance.

The only real question is whether the application of Plaintiffs' RICO claims to the bail bond industry will invalidate, impair, or supersede any aspect of

Montana's insurance code. To "'invalidate' ordinarily means 'to render ineffective, generally without providing a replacement rule or law' . . . [while to] 'supersede' ordinarily means 'to displace (and thus render ineffective) while providing a substitute rule.'" *Humana*, 525 U.S. at 307.

In its RICO claim, Plaintiffs advance predicate acts of kidnapping, extortion, and extortionate conduct surrounding credit transactions. Surely Surety Defendants cannot argue that these acts are expressly permitted by Montana's insurance scheme or that Montana's insurance regulation will be stripped of force if Plaintiffs' claims advance. Nor do Surety Defendants cite any specific statute that would be invalidated or displaced by a RICO claim. The RICO claims are not reverse preempted.

**B. Sufficiency of the Pleading**

Next, Surety Defendants argue that the Complaint does not allege facts sufficient to support a RICO claim. (Doc. 21 at 20.) RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To survive a motion to dismiss, a plaintiff must allege: that the Defendant engaged in

"(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and, additionally, must establish that (5) the defendant caused injury to plaintiff's business or property." *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1086 (9th Cir. 2002). "RICO is to be read broadly . . . [and] is to be liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98 (1985).

Surety Defendants argue that: (1) Defendants are not an "enterprise"; (2) Plaintiffs have not shown a "pattern of racketeering activity" because they have failed to allege colorable predicate acts; (3) Defendants have not exercised requisite control of the enterprise's conduct; and (4) both injury and causation are missing from the Complaint. (Doc. 21 at 20–32.)

### i. Enterprise

Plaintiffs allege three enterprises. (Doc. 29 at 23.) The Court need only address the first because it is inclusive of all Defendants. The Complaint alleges that Allegheny, Fidelity, First Call, Ratzburg, MCAG and its members formed an "association-in-fact" enterprise. (*Id.*)

An association-in-fact enterprise "is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct . . . . [It] is proved by evidence of an ongoing organization, formal or

informal, and by evidence that the various associates function as a continuing unit." *Odom v. Microsoft Corp.*, 486 F.3d 541, 549 (9th Cir. 2007) (en banc) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Additionally, "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 945 (2009).

Surety Defendants argue that Plaintiffs fail to allege any "common purpose or course of conduct" that is separate from each defendant's ordinary business affairs. (Doc. 21 at 20–21.) The Court has found nothing to indicate that the Ninth Circuit requires an enterprise to share a "common purpose" that is separate or secondary from its general business purpose. To the extent Surety Defendants argue that a separate (i.e. unlawful) purpose must unite the enterprise, the Court acknowledges that this is an open question in the Ninth Circuit. *Gomez v. Guthy-Renker, LLC*, No. EDCV–14–0141425–JGB(KKX), 2015 WL 4270042, *9 (C.D. Cal. July 13, 2015); *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 991 (C.D. Cal. 2008). Nevertheless, in *Odam v. Microsoft Corporation* the court made no such requirement.

In *Odam*, the Ninth Circuit determined that Microsoft and Best Buy had formed an association-in-fact enterprise where the companies shared a "common purpose" that was entirely legitimate but carried out through fraudulent means. 486 F.3d at 552. The plaintiff alleged that Microsoft and Best Buy entered into an agreement to cross promote each other's services in order to develop a wider customer base of MSN monthly subscribers. *Id.* at 543. When a Best Buy customer purchased a computer or cellular telephone, the Best Buy employee would give the customer a free MSN trial subscription. *Id.* Unbeknownst to the customer, Best Buy would swipe their credit or debit card, send the information back to Microsoft, who would create an unauthorized MSN user account and would then begin to bill the customer without their knowledge. *Id.* The court held that the entities shared "a common purpose of increasing the number of people using Microsoft's Internet Service" which was a valid "common purpose." *Id.* at 552.

According to the Complaint, Defendants shared "common purposes of contracting with bail bonds clients, collecting bond deposits, and hunting, seizing, and unlawfully restraining bail bonds clients who either fail to appear or whom Defendants deem a risk of forfeiture or financial loss." (Doc. 1 at 39.) It is not clear that Allegheny and Fidelity shared a purpose of "hunting, seizing, and

unlawfully restraining bail bonds clients" with the other Defendants. This purpose seems exclusive to First Call and MCAG—who is not a party to this motion. However, mindful of its duty not to be "stingy" in interpreting RICO's requirements, *Walter v. Drayson*, 538 F.3d 1244, 1247 (9th Cir. 2008), the Court agrees that all Defendants share a common purpose of "contracting with bail bonds clients and collecting bond deposits," in order to make their cut of the premium or bond. As in *Odam*, the Complaint alleges a lawful purpose carried out through fraudulent means.

The Complaint alleges that all entities functioned as a continuing unit. The enterprise has a "hierarchical structure flowing from the underwriters (Allegheny and Fidelity) at the top, to the producers (Ratzburg and First Call), to the enforcers (Baker, Haack, and MCAG)." (Doc. 29 at 23–24.) At the top, Allegheny and Fidelity underwrite the bail bonds, but rely on local bond agents to secure clients. (Doc. 1 at 29.) Allegheny and Fidelity require these agents to bear the risk of forfeiture, which the companies recognize creates a powerful incentive for the bondsman to hire effective bounty hunters. (*Id.* at 37.)[4]

---

[4] In an article published in USA Today, Eric Granof, Vice President of Corporate Communications for AIA Holdings explained this incentive: "As one can well imagine, the motivation to ensure the appearance of any defendant is extremely important to a bail agents' [sic] survival. Receiving $1,000 for a service and then having to pay $10,000 back if you do not do your job is strong motivation . . . . The powerful financial incentive that is built into the bail system is what makes the bail bond industry so effective at what it does: getting defendants to show up for court." (Doc. 1 at 38.)

The Complaint explains that the practices of the industry are deceptive. First Call enters into bond agreements with defendants, using a form contract provided by AIA Holdings (the parent company of Allegheny and Fidelity) that contains multiple pages of fine print that proport to give First Call "the right to apprehend, arrest, and surrender the Defendant" under numerous circumstances including whenever "the Surety (as determined by the Surety in its sole and absolute discretion)" determines that "there [has been] a material increase in the risk assume by the Surety." The Agreement requires the defendant to assume "the peculiar risk of harm" to both himself and others and agree to indemnify the surety for any liability or action arising from these injuries, including payment of all attorney's fees. The Agreement also grants the surety access to "any and all private or public information" about the defendant, including "credit reports, Social Security Records, criminal reports, civil records, driving records, tax records, telephone records, medical records, school records, worker compensation records, and employment records." In addition, the Agreement "irrevocably" grants the surety the absolute right to enter the defendant's residence at any time, without notice and waives all causes of action that might arise from such activity. (Doc. 1-1 at 2, 4.)

Defendants sign away these rights without sufficient time to read the contract, understand its terms, or negotiate different ones. They do so because it is

the only way to secure their release from jail. In sum, the Complaint alleges that the bail bond industry capitalizes on defendants who are between a rock and a hard place through the use of coercive tactics. The entities profit, while anticipating the violent or illegal practices of bounty hunters like MCAG. The Complaint states a RICO enterprise because it indicates that all Defendants work in concert towards the common purpose of contracting with bail bonds clients to collect bond premiums in order to take their respective share.

Finally, the requirement that the enterprise have sufficient longevity to pursue its common purpose is also met. *Boyle*, 556 U.S. at 945. The Complaint documents a longstanding business relationship between all entities. First Call, Ratzburg, Allegheny, and Fidelity have functioned as a continuing unit since June 2014. In turn, First Call and Ratzburg (working as agents of Allegheny and Fidelity) have employed MCAG since approximately September 2015. The Complaint alleges an "association-in-fact" enterprise.

### ii.    Pattern of racketeering activity

To establish a RICO violation, a plaintiff must also point to a "pattern of racketeering activity." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1398 (9th Cir. 1986). "'Racketeering activity' is defined in RICO to mean 'any act or threat involving' specified state-law crimes, any 'act' indictable under

various specified federal statutes, and certain federal 'offenses.'" *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232 (1989). Plaintiffs assert that all Defendants engaged in the predicate acts of "extortionate extension of credit and financing extortionate credit transactions." (Doc. 1 at 39.) Plaintiffs allege that First Call and Ratzburg additionally engaged in kidnapping, extortion, and extortionate collection of credit extensions. (*Id.* at 42.) Surety Defendants argue that many of these predicate acts fail as a matter of law. (*Id.*) The Court disagrees.

First, Plaintiffs state facts sufficient to support a kidnapping charge for the same reasons that its claim for false imprisonment is viable.

Plaintiffs also state a viable claim for extortion. The Complaint indicates that "Ratzburg threatened that if . . . Mitchell did not pay the outstanding amount due on his premium or comply with the bond agreement, Ratzburg would 'get' him." (Doc. 1 at 10.) Surety Defendants argue that this was merely a warning to exercise a contractual right and "what you may do in a certain event you may threaten to do." (Doc. 21 at 23.) This is a question of fact. A jury could find that Ratzburg was not threatening to arrest Mitchell but threatening physical violence to coerce the remaining payment.

Next, Surety Defendants assert that the Complaint does not plead the required elements for extortionate credit transactions. Defendants believe that to

demonstrate a claim under 18 U.S.C. §§ 892–894, a plaintiff must establish that a defendant: (1) extended credit that; (2) would be unenforceable through civil judicial process; (3) was made at an annual rate of interest in excess of 45%; (4) at the time extension of credit was made reasonably believed that the creditor had collected or had the reputation of collection credit through extortionate means; and (5) the total extension of credit exceeded $100.00. (Doc. 21 at 23–24.) This argument is premised upon a misreading of the statute.

Extortionate credit transactions fall under Chapter 42 of Title 18 of the United States Code. The definitions section explains that an extortionate extension of credit is "any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person[.]" 18 U.S.C. § 891(6). Section 892 makes it a crime to engage in "making extortion extensions of credit." 18 U.S.C. § 982. Its default clause explains that "[w]hoever makes any extortionate extension of credit, or conspires to do so, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 892 (a). The statute goes on to provide one special method of proof. Where a plaintiff can prove the elements listed above, she benefits from a rebuttable presumption that the extension of credit was

-30-

extortionate. However, this proof is not required for a viable claim. The statute explicitly notes that "this subsection [describing what is required for a rebuttable presumption] is nonexclusive and in no way limits the effect or applicability of subsection (a) [the default clause]."[5]

Defendants are therefore incorrect. Having failed to meet the enumerated elements, Plaintiffs do not benefit from any presumption. Nonetheless, the Complaint adequately alleges a predicate offense of making extortionate extensions of credit when it describes that Ratzburg permitted Meuchell to delay part of the premium payment and then threatened Mitchell to collect payment. Because the Court has determined that the Complaint alleges predicate acts of kidnapping, extortion, and extortionate credit transactions, Plaintiffs have met their burden to plead the existence of a pattern.

---

[5] Together, these provisions read:

(a) Whoever makes any extortionate extension of credit, or conspires to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

(b) In any prosecution under this section, if it is shown that all of the following factors were present in connection with the extension of credit in question, there is prima facie evidence that the extension of credit was extortionate, *but this subsection is nonexclusive and in no way limits the effect or applicability of subsection (a)*.

18 U.S.C. § 892 (emphasis added).

### iii.  Conduct

In order to be found liable for the "conduct" of an "enterprise" through a "pattern of racketeering activity" the defendant must be legally responsible for that conduct. *See Walter*, 538 F.3d at 1249. In other words, the defendant must have had some degree of control over the "operation or management" of the enterprise's conduct. *Id.* at 1248. Surety Defendants argue that this element is not satisfied.

As the Complaint explains, First Call hired MCAG to conduct business on its behalf. (Doc. 1 at 11.) MCAG reported directly to Ratzburg as evidenced by the members filling out a field report and calling Ratzburg during the arrest of Mitchell to inform him that "the team was securing Mitchell." (*Id.* at 15–16.)

While Allegheny and Fidelity may not have directly authorized MCAG's conduct, those entities were aware of their necessity and aware of the powerful incentive for bond agents to hire effective bounty hunters. (*Id.* at 35–38.) Allegheny and Fidelity created the environment that bred these acts by providing First Call with a form contract which authorized this conduct and by requiring First Call to bear the financial risk of forfeiture. This element is satisfied.

### iv.  Proximate causation

Finally, a viable RICO claim requires that the plaintiff suffer a financial harm proximately caused by the prohibited conduct. *Oscar v. Univ. Students Co-*

*op. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005). Surety Defendants argue that Plaintiffs fail to make this showing because the only harm alleged in the Complaint (damage to the door) occurred as a result of Plaintiffs allegations of kidnapping, which Defendants insist is not colorable. (Doc. 21 at 21.) The Court has already concluded that kidnapping can function as a predicate offense in this case. Surety Defendants go on to argue that proximate causation is not satisfied because the causal connection between the RICO violation (the Agreement) and the alleged harm (injury to the door) is too attenuated. (*Id.* at 31.) To the contrary. Proximate causation is relatively clear.

To be the proximate cause of an injury there must be "some 'direct relationship' between the injury asserted and the injurious conduct[.]" *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 773 (9th Cir. 2002) (citations omitted). Here, the injury to the door occurred as a direct result of MCAG entering Mitchell's house in order to arrest him and in order to recoup a $115 payment that Ratzburg represented was still outstanding. Having addressed each of Surety Defendants' arguments, the Court now concludes that the RICO claims are properly stated and may advance.

### III. Motion to Strike

Surety Defendants filed a Motion to Strike targeting several documents recently filed by Plaintiffs: (1) Notice of Withdrawal of Motion for Partial Summary Judgment (Doc. 42); (2) Motion for Partial Summary Judgment (Doc. 43); (3) Brief in Support of Motion for Partial Summary Judgment (Doc. 44); (4) Statement of Undisputed Material Facts (Doc. 45); and (5) the Declaration of Toby J. Marshall in Support of the Motion for Partial Summary Judgment (Doc. 46).

On June 27, 2019, Plaintiffs filed their original Motion for Partial Summary Judgment (Doc. 30). On August 5, 2019, Surety Defendants filed their response to Plaintiffs' Motion and pointed out a procedural shortcoming in Plaintiffs' Motion, that being Plaintiffs' failure to comply with Local Rule 56.1(a)'s requirement that a motion for summary judgment be accompanied by a statement of undisputed material facts. (Doc. 38 at 6.) For their part, Plaintiffs assert that they "initially overlooked the need for a Statement of Undisputed Material Facts because the only facts material to Plaintiffs' motion are the terms of the Bail Bond Agreement itself." (Doc. 49 at 2.) To cure the procedural defect, Plaintiffs promptly filed a Notice that they were withdrawing the procedurally defective motion "without prejudice to Plaintiffs refiling a motion for partial summary judgment." (Doc. 42

at 2.) Plaintiffs then filed a second motion and a substantially similar brief accompanied by a Statement of Undisputed Facts. (Docs. 43, 44, 45.)

Surety Defendants now argue that they will be prejudiced if asked to respond to Plaintiffs' recently filed motion. Defendants insist that the new brief contains a material difference because it makes no reference to the circumstances under which Meuchell reviewed the Agreement. (Doc. 48 at 3, 4.)

Having previewed both briefs at issue, Surety Defendants concern over the difference between the briefs is immaterial because Plaintiffs do not appear to hinge their argument on the facts surrounding Meuchell's signing of the Agreement. Nevertheless, the citations in Plaintiffs' second brief to their Statement of Undisputed Facts will be necessary. Therefore, the Court will deny Surety Defendants' Motion to Strike and allow the second Motion for Partial Summary Judgment to stand. The Court will permit Surety Defendants additional time to make any adjustments to their response and refile it. Additionally, Plaintiffs are precluded from using Ratzburg's affidavit (Doc. 39-2) for any purpose, including impeachment.

IT IS ORDERED that Defendants' Motion to Dismiss (Doc. 20) is GRANTED in part and DENIED in part. Claim 10 of the Complaint (Doc. 1) is

Dismissed. All other claims at issue in Defendants' Motion to Dismiss (Claims 1,

2, 4, 5, 6, and 7) will advance.

IT IS FURTHER ORDERED that Defendants' Motion to Strike (Doc. 47) is

DENIED. Defendants shall have fourteen days to file a Response.


DATED this 9th day of October, 2019.

Dana L. Christensen, Chief Judge
United States District Court